BOYCE et al. v. STEWART-WARNER SPEEDOMETER CORPORATION.

(Circuit Court of Appeals, Second Circuit. December 15, 1914.)

. No. 119.

1. PATENTS ⊜⟹297—SUIT FOR INFRINGEMENT—PRELIMINARY INJUNCTION.

The granting of a preliminary injunction against infringement of a patent rests in the sound discretion of the court; but, while a previous adjudication of the validity of the patent is not indispensable, when the patent is new and there is a substantial controversy as to its validity, the case must be exceptional in its circumstances to justify such action, and the necessity for the injunction should be clearly shown.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 481–488; Dec. Dig. ⊜⟹297.

Ground for denial of preliminary injunctions in patent infringement suits, see note to Johnson v. Foos Mfg. Co., 72 C. C. A. 123.]

2. PATENTS ⊜⟹126—VALIDITY—CLAIMS NOT WITHIN ORIGINAL APPLICATION.

An amendment to an application for a patent must be within the scope of the original disclosure, and a claim made by amendment to matter not disclosed in the application as originally filed is invalid.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 178; Dec. Dig. ⊜⟹126.]

3. PATENTS ⊜⟹129—SUITS FOR INFRINGEMENT—DEFENSES.

A defendant in an infringement suit is not at liberty to raise the question of want of utility of the patented device, if he has himself infringed; infringement being an admission of utility.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 182½–186; Dec Dig. ⊜⟹129.]

4. PATENTS ⊜⟹328—VALIDITY AND INFRINGEMENT—MOTOMETER.

The granting of a preliminary injunction against infringement of the Boyce patent, No. 1,090,776, for a motometer, or device for indicating the condition of internal combustion engines, especially automobile engines, *held* within the discretion of the court, although the patent was new and its validity unadjudicated; it clearly appearing that the device is within the specification, was not anticipated, and is of great utility.

Appeal from the District Court of the United States for the Southern District of New York.

This cause comes here upon appeal from an order entered by the District Court of the United States for the Southern District of New York granting a preliminary injunction restraining defendant from an alleged threatened infringement of letters patent No. 1,090,776, issued March 17, 1914, to Harrison H. Boyce, for an indicating system for internal combustion engines. ·

The Stewart-Warner Speedometer Corporation, a corporation organized under the laws of the state of New York, is the defendant. The bill alleges that the Stewart-Warner Speedometer Corporation of Virginia and the Stewart-Warner Speedometer Corporation of New York have conspired and are conspiring to perform certain specified acts of infringement or of threatened infringement; but the Stewart-Warner Speedometer Corporation of Virginia is not made a party to the suit, not being within the jurisdiction of the court. The Motometer Company, a corporation organized under the laws of the state of New York, is the exclusive licensee of Boyce, and is joined with him as a complainant.

⊜⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

S. E. Darby, of New York City, for appellant.
Frederick P. Fish and Clifford E. Dunn, both of New York City, for appellees.

Before COXE, WARD, and ROGERS, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). The complainants have sought and obtained a preliminary injunction restraining defendant from the threatened infringement of their patent, and the question is whether the preliminary injunction should have been granted upon the facts as disclosed by the affidavits, or whether relief should have been withheld until a hearing upon the merits.

The patent in suit is for an invention known in the trade as a motometer, and it relates to a system for indicating the condition of internal combustion engines, and particularly engines with water-jacketed cylinders. It is an invention particularly applicable to automobile engines of internal combustion type. The object of it is well set forth in the specification of the patent which is as follows:

"This invention relates to a system for indicating the condition of internal combustion engines of various types, and particularly of those styles wherein the cylinders are cooled by a fluid medium which is circulated therearound or thereabout, the indicating means being located without or not in direct contact with the cylinders.

"While my invention is generally applicable to stationary and other explosive engines of any character and under varying conditions of service, it is especially adaptable for use in connection with automobiles and the like, wherein the engine cylinders are cooled by a liquid delivered or supplied thereto through any suitable medium, as, for instance, from a radiator or the like, which is customarily situated some distance away from the engine cylinders, though I would have it expressly understood that I in no wise limit myself to this specific application or embodiment of my invention, which I have selected as a basis for illustrating and describing my invention, merely for the purpose of rendering a clear and comprehensive understanding of the scope and novel features thereof.

"My invention broadly comprehends the provision or arrangement of means for indicating the condition or temperature of the engine, the action of the temperature indicating means being governed or controlled by the water or other circulating medium employed for producing such variations in the temperature of the cylinders as may be necessary or desired by the operator.

"I have found that many, if not most, of the troubles to which internal combustion engines are subject, result directly or indirectly in a change in the temperature of the engine and cooling system, this being true, for instance, of such contingencies as imperfect lubrication, improper adjustment of the carburetor, insufficient water in the radiator, failure of proper circulation of the cooling water, broken fan belt, etc., and it is the object of the present invention to provide an effective indicator governed by such changes of temperature which will call to the attention of the operator the existence of conditions inimical to the satisfactory operation of the engine, arising from any of these or similar causes."

The complainant's device embodies the idea primarily of affording protection against the great evil of engine overheating, for which previously there had existed no remedy. It also provides an indication to the operator of the thermal condition of his engine. Both of these results are accomplished by the use of a temperature responsive device

located in the air space at the top of the radiator of the engine cooling system. Through this instrument a continuous temperature indication is given for the guidance of the operator. This indication is not of exact water temperatures, but shows changes in thermal condition. When the point of danger is reached and steam is formed in the radiator, the instrument affords an unmistakable trouble signal. This is due to the peculiar organization of the apparatus whereby the temperature responsive element or thermometer normally indicates a lower, but substantially proportional, temperature with relation to the water temperature, which jumps to the actual temperature upon the occurrence of dangerous conditions.

The device which defendant proposes to put on the market, and which is called the Stewart radiator meter, is an instrument of exactly the same character as the Boyce motometer. The circular which defendant has put out shows conclusively that it is designed for exactly the same purpose, and that it does exactly the same work in exactly the same way. Like the Boyce motometer, it is designed to be attached to the radiator cap of an automobile, and it has an indicator which provides temperature readings visible from the driver's seat. The indicator is governed by a temperature responsive element which differs from that in plaintiff's device in length by about one-half an inch, which projects downwardly through the radiator cap exactly as does the Boyce device. In the latter device the temperature responsive element is located in the air space above the water, while in defendant's it extends into the water. But it appears from defendant's own circular that it, like the complainant's device, "is affected by the temperature of the air over the water." And as an automobile cannot run more than a few miles before a certain proportion of the water in the radiator is dissipated and lost by evaporation, expansion, and overflow, and that ordinarily the radiator does not begin to heat until the machine has run 10 miles, it is perfectly clear to us that the thermostat bar or temperature responsive element in defendant's device constitutes a palpable and obvious infringement, and one that would be enjoined upon the merits, if at final hearing the complainant's patent was found valid.

It appears that gasoline engines such as are now universally used in automobiles differ from other types of power units in that the power is produced in the cylinder by the explosion of a gaseous mixture. This explosion generates so much heat that unless provision, in addition to lubrication, is made for cooling the engine parts, they would be destroyed. All automobile engine cylinders are now provided with a water jacket, through which cool water is forced to circulate by means of pumps, syphon, and other arrangements. And a well-designed engine, if properly lubricated, operates efficiently so long as its cooling system works satisfactorily. But any derangement of the system means overheating, whether it be from low water, a broken or clogged water pump, a broken fan belt, or faulty lubrication. In order to secure the highest efficiency of operation and regular and flexible action in an automobile engine, it is essential that the cooling be not carried to an excess. In a cold engine the charge is not exploded with regularity in the cylinders and fuel is wasted. Engines cannot be safely operated at a temperature which raises the cooling water in the cylinder

jackets above boiling, as such a temperature causes the water to boil away and fail to perform its cooling function. The closer the temperature is kept to the boiling point, the more efficient is the operation of the engine. In standard makes of automobiles the temperature of the water in the cooling system will be from 190 degrees to 202 degrees F. when representing safe conditions, while 212 degrees F., or boiling, indicates danger. The mere attaining a dangerous degree of heat in the engine is not necessarily fatal. But the damage is done by continued operation of the engine at the dangerous temperature.

[1] It is necessary to keep in mind that the granting of a preliminary injunction rests in the sound judicial discretion of the court of original jurisdiction. The question is not whether, on the facts as disclosed, the appellate court would have issued the injunction. It is rather whether the trial court abused its discretion in the course it adopted. The question for us is whether the record clearly establishes that the court below abused its discretion and departed from the rules and principles established for the guidance of the courts of equity in cases of this character. American Grain Separator Co. v. Twin City Separator Co., 202 Fed. 202, 206, 120 C. C. A. 644 (1912).

It was at one time thought in England that a court of equity should not interfere for the protection of a patent by injunction until the validity of the patent had been established at law. But the rule became established in that country to the contrary. Universities of Oxford and Cambridge v. Richardson, 6 Vesey, 689. And in this country the federal courts have been inclined to view with considerable liberality the issuance of an injunction, although the complainant may not have established the validity of his patent in a trial at law before making application for an injunction for the protection of his rights. This court has never held that a preliminary injunction will not be issued in any case where the validity of the patent has not been previously established. But while recognizing the fact that it is not necessary that the validity of the patent should have been previously determined, we have been reluctant to approve the granting of a preliminary injunction where the patent was comparatively new. And it has been our practice to disapprove of its issuance in a case at all doubtful and where there appeared to be any substantial controversy between the parties. The case at bar must be exceptional in its circumstances to justify any departure from the practice so well established. If a patent alleged to have been infringed is an old one, that circumstance in itself affords some reason for allowing a preliminary injunction to issue to restrain an alleged infringement. But where a patent is new, its validity necessarily having been neither adjudicated nor acquiesced in, the issuance of a preliminary injunction without a hearing upon the merits is usually regarded as unwarranted and improper. But the fact that a patent was issued as of yesterday may not always lead a court to refuse a preliminary injunction. The case must be very exceptional in its circumstances, however, to justify such a course. The matter rests in the discretion of the court, and the right to and the necessity for the injunction should be clearly shown.

In the case at bar there has been no prior adjudication of the validity

of the patent. The patent itself is of very recent date, having been issued but three weeks before the suit was commenced. The patent sued on, as above stated, was issued on March 17, 1914, and this suit was commenced on April 11, 1914, just 25 days after the issuance of the patent. The order to show cause why the preliminary injunction should not be granted was made without notice and served upon the defendant on April 14, 1914. The defendant filed its answer on May 1, 1914, and the motion for the injunction was heard and subsequently granted and the order entered on May 21, 1914. Ordinarily a proceeding of so summary a character would afford very little opportunity for investigation and research to discover what the prior art might disclose concerning the patent alleged to have been infringed. It appears, however, that the matter of the complainant's device was brought to the defendant's attention early in October, 1913, by one of the complainant's associates while the matter was still pending in the Patent Office. At that time defendant made full inquiry as to the patents then pending and as to the device itself. This was at an interview which took place between Mr. Townsend, and one Whitney, who was the "right-hand man" of Mr. Stewart, of the Stewart-Warner Corporation. Mr. Townsend in his affidavit states:

"He seemed particularly interested in the patent situation, and asked me what patents we had. I informed him that at that date we only had design patents, but that we had other patent applications in the office relating to the taking of the temperature of the air above the water, which we knew to be the only practical method. He stated that design patents were practically worthless as a slight change could be made to avoid them. However, he stated there might be something good in the basic idea of recording the temperature of the air above the water. He asked for particulars as to why we found it advisable to patent and use this method of construction.

"I went into detail, showing him the disadvantage of submerging the bulb or temperature responsive element of the motometer and the benefits to be derived by not submerging the bulb, viz.: Quick rise in case of danger, best method of recording broken water pump, and particularly the fact that a submerged bulb was almost useless on a hot summer day on thermo-syphon cars, because the rise in temperature from normal running conditions to a condition of danger was so slight. From a commercial standpoint, I explained that the instrument not taking the temperature of the air above the water would be almost useless on Fords and Overlands, as these cars employ the thermo-syphon system of cooling and build (include?) almost half the cars made in the United States."

The defendant at once proceeded to get up the device which is alleged to infringe and in January, 1914, had it on exhibition in Chicago. It appears that Mr. Whitney had stated immediately after the interview with Mr. Townsend that he did not believe the complainant's patents were good. The defendant, therefore, had actual knowledge of the complainant's device and patent claim for more than six months prior to the hearing of the motion for the preliminary injunction. And as with full knowledge of the plaintiff's claims it proceeded to get up its infringing device; it has no right to complain that it was called upon to show its justification and submit its defense six months later.

If there is an arguable question as to the patent's validity, clearly the injunction should not have issued at this stage of the proceedings. Courts do not attempt to decide doubtful questions on motions for a

preliminary injunction, and it is of course well settled that in case of doubt such an injunction will not be granted, especially where the defendant is financially responsible. And in this suit no question is raised as to the financial responsibility of the defendant. The defendant company and its subsidiaries constitute an immense organization having a capital of over $13,000,000, and it is said to be the largest manufacturer and distributor of automobile accessories in the world.

While giving full recognition to the general rule that ordinarily, where the validity of a patent has neither been adjudicated nor acquiesced in by the public, an injunction should be refused, we have not applied it to cases where no doubt was entertained as to the validity of the patent. In Fuller v. Gilmore (C. C.) 121 Fed. 129 (1902), Judge Lacombe said:

"Defendant calls attention to the circumstance that the patent has never been adjudicated, and is of such recent date that long acquiescence cannot be shown, as sufficient ground for refusing preliminary injunction. * * * When the specification shows that, assuming facts of common knowledge, it will probably need some affirmative evidence to indicate the presence of invention, or when some testimony put in by defendant as to the prior state of the art, slight though it be, indicates that there may be some arguable question as to validity, or as a construction of the claims broad enough to cover the device complained of, then preliminary injunction on affidavits is refused. But where the patent appears to be novel, useful, and ingenious, and there is no evidence at all assailing its validity, the presumption arising from issue of letters patent will be sufficient to warrant injunctive relief. The same rule should apply where the sole evidence as to prior art is wholly unpersuasive."

In Lambert Snyder Vibrator Co. v. Marvel Vibrator Co. (C. C.) 138 Fed. 82 (1905), we held that the fact that a patent had not been adjudicated was not sufficient ground for refusing a preliminary injunction against its infringement, where the infringement was clear, unless there was a substantial question as to its validity. And in Palmer v. Wilcox Mfg. Co. (C. C.) 141 Fed. 378 (1905), we held that the fact that a patent was unadjudicated would not defeat the right to a preliminary injunction against its infringement, unless it also appeared from common knowledge or from the prior art shown that there was reasonable ground for doubt as to its validity; the presumption arising from its issuance by the Patent Office being sufficient to warrant injunctive relief against an infringer.

[2] The defendant claimed that the Boyce patent was void because as issued it was for an invention entirely different from that presented in the application originally filed. An applicant must in his application describe not merely the principle of his invention, but the best mode in which he contemplates applying the principle, and he must describe the means he proposes to employ in such full, clear, and exact terms as will make it possible for those skilled in the art without other aid to make and use the invention. And if his application is amended the amendment must be within the scope of the original disclosure. A claim made by amendment to matter not disclosed in the application as originally filed is invalid. Hobbs v. Beach, 180 U. S. 383, 21 Sup. Ct. 409, 45 L. Ed. 586 (1901).

It appears that changes were made in the specification of the application resulting in the patent in suit. Those changes tended to greater clearness and fuller explanation of the invention, and thus made the patent as issued more valuable to the public as a disclosure of the patented invention. But we are unable to discover that the patent as issued is not the identical invention which Boyce described in his application as filed. Both the specification and drawing of the application as filed clearly show that the temperature responsive element or thermometer was mounted, and was intended to be mounted, in the air space at the top of the radiator, and not in the water in the radiator. The inventor does not state that the temperature of the atmosphere in the radiator air space will be the same as the temperature of the water, but that it will correspond thereto, by which was meant simply that there would be a relation or correspondence between the two temperatures. That there is such a correspondence is of course indisputable. The temperature of the air space does correspond with the temperature of the water temperature. It is this fact which gives to Boyce's device the great advantages it possesses and causes it to operate in the novel manner it does.

The defendant claimed that the complainant's device was anticipated by the prior art. To authorize the allowance of a patent there must be a substantial difference in principle from prior inventions. To amount to anticipation it is essential that there should be identity in substance, and the two things must accomplish the same purpose by substantially the same means, operating in substantially the same way. And a patentee's claim to an invention is anticipated when it appears that another made the invention before the date when the patentee made it. The anticipation may consist of prior patents or publications. And if prior invention is shown to have existed and been in use, it is clearly of no consequence whether it was patented or not. In the case at bar our attention has been called to a number of prior patents which defendant alleges show that the complainant's device was anticipated. But an examination of the patents referred to convinces us that there is absolutely nothing in the claim of anticipation by the prior art. The prior patents do not disclose or in any way suggest the invention of the patent in suit. The Vissering patent, No. 904,163, which is the only one of these patents we deem it necessary to refer to, was a device which had for its object to provide a gauge or indicator which would show the true height of the water in the radiator. It has no relation whatever to the Boyce invention, except that it was mounted on top of an automobile radiator and that the complainant's motometer is also mounted on the radiator. The Vissering gauge is certainly incapable of performing the functions of the Boyce motometer. Its mode of operation is certainly absolutely different, and it has no temperature responsive element and indicating means controlled thereby. The record discloses absolutely nothing antecedent to the Boyce invention even remotely suggesting the inventive thought embodied therein. No prior use which has ever been made of a thermometer was brought to the attention of the court which contained any suggestion of the novel mode of operation used in the Boyce device, nor did it appear that any

thermometer was ever used to secure any result at all analogous to that secured by the invention of the patent in suit.

The evidence shows that prior to 1912 there was absolutely nothing known in the automobile art which would enable one running an automobile to discover an undue heating of the engine in time to rectify it and avoid irremediable damage. It was not until complainant's motometer was invented that any instrument existed which could be used in connection with automobiles to give warning of a dangerous condition of the engine. In the face of the affidavits which were presented, the utility of the complainant's device cannot be doubted. The affidavit of one who had been driving racing cars in this country and abroad since the year 1904 was presented to the court, in which the affiant declared:

"For my own part, I would not think now of driving a car in a race without a motometer, and the consensus of opinion of the other drivers to whom I have talked is the same. The instrument not only gives warning of serious trouble in ample time to rectify it, but it enables a driver to know at every moment and without moving from his seat, exactly what his engine is doing and whether or not it is operating with the greatest efficiency. It enables him to regulate his speed and power so as to get the greatest possible efficiency out of the car, and the rapid rise of the indicator is a sure sign of serious trouble. In my judgment the motometer is one of the most important contributions to the automobile which has been made in years, and it has supplied a want which was long felt and appreciated, but which it seemed impossible to fill. Prior to its invention there was absolutely nothing of the kind known here or abroad, and we were compelled to drive cars blindly, and only knew of heating troubles after it was too late to remedy them."

An affidavit presented to the court, made by one who had been engaged in the occupation of a driver of racing automobiles continuously since 1909, stated:

"In my opinion the Boyce motometer is an exceedingly valuable addition to the equipment of any automobile, and is well-nigh indispensable in racing or touring under severe conditions. I would not think of driving in a race to-day without having my car equipped with one, nor would I go on a long tour without one. I believe it to be one of the most useful automobile accessories that has ever been placed upon the market."

An affidavit presented to the court, made by a dealer in automobiles and accessories, stated:

"I first heard of the Boyce motometer when I attended the Indianapolis races on May 30, 1913. Previous to that time in all my experience I had never heard of any device or apparatus for warning the driver of an automobile of the overheating of his engine, or of any of the troubles leading thereto, or for indicating to the driver the condition of the engine or cooling system. When I was in Indianapolis, as stated, I noted that most of the drivers in the 500-mile race had their cars equipped with motometer which, as an entirely new device to me, attracted my attention. I was acquainted with many of the drivers, and talked with them about the motometer, and they all without exception praised it highly and recommended it as a very useful device. I thereupon procured a motometer, and on my return to Chicago I applied it to my automobile, a Mercer raceabout. Soon after I purchased additional motometers, with which I equipped the three demonstrating cars belonging to the Schillo Motor Sales Company, of which I was vice president. * * * My experience with the motometer as dealer and user has convinced me that the device is an invaluable addition to automobile equipment. I would never think of driving a car without one at this date. In my opinion, the motometer has filled an important place in the automobile art, for which

nothing ever existed before. I believe that there is a tremendous field for this device, and every car ought to be, and doubtless in a few years will be, equipped with one. In my opinion it is a more useful and necessary part of the equipment of an automobile than the speedometer, which is now universally employed."

An affidavit presented to the court, made by the vice president of the Auto Supply Company of New York, stated:

"For the past year the Auto Supply Company has been handling the motometer in connection with its business and has sold a large number of them to automobile users. So far as I have been able to observe they have given great satisfaction to their purchasers, and I have never had a single instrument returned as unsatisfactory in operation or for failing to accomplish the results claimed for it. I believe that the Boyce motometer is a useful and meritorious addition to automobile equipment, and that it is the first device ever placed on the market for accomplishing the special and important functions for which it is designed."

An affidavit presented to the court by a consulting engineer, who had been engaged in engineering work for 22 years and for the last 8 years in automobile engineering, stated:

"The Boyce motometer was first brought to my attention at the New York Automobile Show in January, 1913. Prior to that time I had never heard of any apparatus or construction enabling the driver to obtain timely information of the existence of dangerous conditions in the engine or for exhibiting to him while driving the conditions under which the engine was operating. There was absolutely no instrument in use for accomplishing these purposes, so far as I am aware. Moreover, if any such device had been known I believe I should have heard of it, as in the year 1909 I made an exhaustive investigation and conducted extensive experiments on apparatus for the thermal control of steam generation for steam driven vehicles. In the course of this investigation, I looked up everything I could find about the thermal control of engines, but I never came across anything like the motometer. * * * I was soon so convinced of the merits of the motometer that I had them put on all of the Mercer racing cars, as a protection against accidents from overheating, which is very common under the 'severe conditions of racing. The motometers proved their value many times on these cars. * * * My experience has emphatically convinced me that the motometer is a most useful and valuable addition to automobile equipment, and I believe that it will meet with a large and ever increasing sale in the future. In my opinion it will eventually be demanded by every automobile user as an essential part of the equipment of his car. It fills a real need in the industry."

It also appears that upward of 10,000 Boyce devices have already been sold in the short time they have been on the market and that, although sold on a condition that the device might be returned within 30 days, if found unsatisfactory, and the money refunded, not one single instrument was ever returned.

[3] The defendant claimed that the patent in suit is for a device which is lacking in utility. To warrant the allowance of a patent it must be capable of some beneficial use. An invention is deemed useful when it will operate to perform the functions and secure the result intended and its use is not contrary to public health or morals. The issuance of a patent is prima facie evidence of utility, and the burden is always on the defendant to show that it is not useful. Parker v. Stiles, Fed. Cas. No. 10749, 5 McLean, 44. But the defendant is not at liberty to raise the question of a want of utility if he has himself infringed, because

infringement amounts to an admission of utility. International Tooth Crown Co. v. Hanks' Dental Association (C. C.) 111 Fed. 916, affirmed in 122 Fed. 74, 58 C. C. A. 180. The court below found infringement and in our opinion was clearly justified in so doing. Therefore the defendant is estopped from setting up a want of utility. It is perfectly evident, however, that there is no want of utility in the complainant's device, which is one of very great usefulness.

The evidence to show that the device is without utility is wholly unpersuasive, and the criticism of it contained in the affidavits of the experts on behalf of the defendant is so evidently based upon an entire misunderstanding of the invention that we feel justified in absolutely disregarding it. The theory of these experts is that a device which merely indicates when water temperature of 212 degrees F. is reached is useless. In the first place, the Boyce device indicates temperature changes at all times, although it does not indicate exact water temperature. Changes in the water temperature cause changes in the air temperature in space about it. And in the second place the mere attainment of a water temperature of 212 degrees F. is not necessarily destructive of the automobile engine or disastrous to the mechanism. The damage to the engine and the mechanism is not wrought the moment threatening conditions arise. The danger arises from disregarding the conditions after they arise and continuing to operate the machine in disregard of them. The Boyce device, by providing a warning signal indicating that the point of excessive heat has been reached, is an effective and timely warning that a dangerous degree of overheating has been reached, and if it is not disregarded all serious trouble can be avoided.

[4] If we entertained a doubt as to the utility of this device, or as to its having been anticipated by the prior knowledge and use, or as to its being a different invention from that originally disclosed and claimed in the application on which the patent was granted, we should think an abuse of discretion had been committed in granting an injunction before final hearing. But being convinced as we are in respect to these matters, we see no reason to think that the court abused its discretion in awarding the injunction.

The order granting the preliminary injunction is affirmed.