### AMERICAN ENGINEERING CO. v. STOKER CASTINGS & SERVICE, Inc., et al.

### No. 118.

District Court, D. Massachusetts.

Dec. 21, 1944.

See, also, 44 F.Supp. 96.

J. L. Stackpole and Fish, Richardson & Neave, all of Boston, Mass., and Charles H. Howson, Kennard N. Ware, and Carl F. Sible, all of Philadelphia, Pa., for plaintiff.

Thomas M. Vinson, of Winchester, Mass., for defendants.

FORD, District Judge.

The plaintiff, a Pennsylvania corporation and manufacturer of heavy industrial machinery including the Taylor underfeed stoker, has brought this suit against the defendants, a Massachusetts corporation manufacturing replacement parts for underfeed stokers and the general manager and operator of it, for infringement of United States Patent No. 1,930,897 (hereinafter called the Hughes patent) issued October 17, 1933 to William J. Hughes, on application filed April 13, 1928. The plaintiff is the assignee-owner of the patent in suit. The defenses are invalidity and non-infringement.

The patent in suit is for an improvement of a tuyere block which is a part of underfeed stokers. The latter are devices for (1) mechanically and continuously supplying coal to the combustion chambers of furnaces; (2) supplying air to the fuel bed; and (3) disposing of ash from the fuel into a dump. Air is supplied to the coal through a series of flat plates or tuyere members superimposed in stepped rows one above the other between the coal channels. The tuyeres with suitable openings or passages through them are connected with an air-box and the air flows through the passages into the coal mass in the furnace. Tuyeres in place in a furnace have the appearance of a flight of stairs and slope from the front end of the furnace downwardly toward the rear. They are parallel to each other and are spaced evenly apart. The spaces between the tuyeres are called

the retorts into which the coal is supplied by means of rams. The rams force the coal forward and upward so that it falls over the tuyeres where it is burned. The burned coal or ash falls toward the rear of the furnace due to the action of the rams and the gravitational force acting on the inclined tuyere rows. Each tuyere block is a flat, plate-like piece of cast iron measuring approximately 1' x 1½' x 2" with a rounded or toe-like forward end extending, when in place, toward the rear of the furnace. The air ports are on the under side of the tuyere block and are formed by a multiplicity of almost parallel ribs or iron strips which extend inwardly from the forward ends or toe portion of the tuyere block. The air which is introduced to the combustion chamber through the air channels controls the efficiency and rate of combustion. It also cools the tuyere blocks which, because of their relatively cheap cast iron construction, gradually melt or fuse from high temperatures.

### The Problem.

When Hughes applied for his patent it was old to provide spaced ribs out to the toe end of tuyeres for defining air passages or ports for the passage of air into the fuel chamber of furnaces. Hughes claimed that air passages extending to the toe or forward portion of the tuyere produced a direct blast that caused "a forging effect at the forward end of the tuyere, with the result that the coal is heated to the melting point of the ash, and, when the ash melts, it flows downwardly on the tuyeres and closes the air discharge passages or channels thereof"; that inasmuch as no air flowed through the blocked passage, the air trapped in the passage would rise to the same temperature as the tuyere; that, consequently, the trapped air would not absorb any of the heat of the tuyere and cool the tuyere with the result that the portion of the tuyere where the block occurred would become overheated and melt, necessitating a replacement of the tuyere.

The defendants contend that Hughes' claim that molten ash drips upon the edges of the tuyere blocks is without foundation; that the iso-thermal temperature lines run horizontally over the tuyeres and the tem-

perature of the area directly over the tuyeres is sufficiently low to cause dripping molten ash to solidify before it reaches the tuyeres and fall toward the rear of the furnace by force of the rams and gravity. It is not disputed by the plaintiff that this was the theory universally held by expert engineers before 1928. Several engineers, called by the defendants, maintained that this theory is still generally held; that the iso-thermal temperature lines run horizontally over the tuyeres and the hottest part of the fire is in the upper region of the fuel bed and the temperature falls approaching the air directly over the tuyeres because of the green coal coming in from the retorts onto the tuyeres. However, since 1938 there has definitely arisen a new school of thought with respect to the location of the high temperature areas in the fuel bed. This was the result of a series of scientific tests partly supervised by plaintiff's witness, Mayers, a mechanical engineer, in collaboration with five associates. These tests were made in 1937-8 at the Hell Gate Generating Station. These experts found that the temperature ranges were in vertical instead of horizontal zones, the latter being their preconceived belief. The experts further found that one of the hottest parts of the fire (above the fusing point of ash) in the fuel bed is about two inches above the level of the tuyeres and that the tuyeres were kept from melting (fusing point of 1800°-2000°) by the cooling effect of the air circulating over the tuyeres. The witness Mayers further testified, in support of the contention that Hughes was solving an actual and not, as contended by the defendants, a purely theoretical problem, that molten ash from low fusion coals would remain in that state until it came in contact with the tuyere and there reached a temperature below its fusion point. It may be stated at this point that in high fusion coal (2600°-2800°) the witness Mayers did not contend that molten ash would reach the tuyeres as the ash would solidify long before it reached the tuyeres and find its way into the ash pit. The problem then before us concerns only coal with a relatively low fusion point. In low fusion coal whose temperature would not drop below the fusion point until it struck the tuyeres, the

expert testified that although most of this found its way to the ash pit, yet some of the solidified particles would rest on the tuyere and other slag particles not making thermal contact with the tuyere would not be chilled, and with sufficient heat remaining in the slag to keep it molten, a molasses or puddle-like mass would build up, block the air passages and cause the tuyere to burn up, at least in the region of the block.

The clogging condition described by Mayers was the condition that Hughes in his specification described as the problem he was attempting to solve and thereby accomplish two purposes: (1) to give longer life to the tuyere blocks and (2) to provide better combustion by a free flow of air into the fuel chamber.

I have gone into some detail to point out the problem which Hughes stated in his specification concerned him. At the trial, I sought from the plaintiff some direct evidence to support the contentions made by Hughes, Mr. Mayers and his associates that what they claimed was transpiring in the fuel chambers with respect to the air passages in the tuyeres was actually taking place. None was forthcoming and it is probably fair to say such evidence would be extremely difficult to produce since it would be a mere matter of chance to determine the exact moment when such a condition, as described by the plaintiff's witnesses, would obtain. The court also sought some direct evidence that Hughes actually did accomplish his purpose through his construction, i.e., lengthen the life of a tuyere block. No evidence of any actual tests in this direction was presented. However, the results of such if they were made would be helpful on the question of utility and of probative value in sustaining the contention of the plaintiff that Hughes' device reflected "that degree of ingenuity and usefulness which raises it above an improvement obvious to a mechanic skilled in the art, and entitles it to the merit of invention." Expanded Metal Co. v. Bradford, 214 U.S. 366, 381, 29 S.Ct. 652, 656, 53 L.Ed. 1034.

The final word on the problem aspect of the case is that the weight of the evidence tends to support the contention that where low fusion point (1800°) coal is used, in some instances, a curtain of slag will form over the outlet end of one or more air passages in a tuyere block, probably quite by accident.

All six claims of the Hughes patent are in suit. Claim 5 is typical: "5. A tuyere block, comprising a substantially flat fuel supporting portion, having on its nether side depending means defining air channels, said means terminating inwardly of the edge of said fuel supporting portion, and the ends of said means and the projecting edge of said fuel supporting portion forming in effect a channel which communicates with said first mentioned air channels."

As reflected in the specification, what Hughes did to prevent the air channels in the tuyeres from clogging was to eliminate or cut off a portion of the ribs forming the air channels, causing the ribs to terminate short of the periphery of the tuyere. This allowed the forward end or toe portion of the tuyere plate to project beyond the outer ends of the air channels thereby overlying them and forming a covering, or rim, similar to the eaves of a house, over the outer ends of the air passages or ports. As a result, when slag dripped over the toe of the tuyere plate it would form a curtain hanging vertically from the toe to the fuel bearing surface of the next lower tuyere. The curtain necessarily would fall away from the ends of the air passages and the air would continue to flow around the obstruction and find an exit.

### Conclusions.

There is no dispute that tuyeres for stokers were old in the art when Hughes applied for his patent in 1928. In the Alpern (No. 1,123,063, issued December 29, 1914) and Thompson (No. 1,293,985, issued February 11, 1919) patents, the channel forming ribs on the under side of the tuyere plate extended to the edge of the toe portion of the tuyere member. Hughes seems to have been the first to conceive the possibility of the slag drip blocking the air passages of the tuyeres. It may be said that it is not too clear how he reached his conclusion. He evidently failed to differentiate between high and low fusion

coals. It was conceded by the plaintiff that there was no problem presented with respect to the former. It should be stated that Hughes was not the first to advance the idea that the tuyeres were adjacent to the hottest part of the fire. Thompson (No. 1,293,985) disclosed this in his specification in 1919. Apparently, neither Hughes nor Thompson thought the temperature lanes were vertical. If either did, he did not say so. From their respective specifications it appears they thought the hottest part of the fire was in a horizontal lane directly over the tuyeres. Hughes certainly exposed no theory of a slag curtain being formed in the manner described by Mayers, the plaintiff's expert. However, as I have stated, I believe it has been demonstrated by the expert testimony that the temperature lanes are vertical in underfeed stoker furnaces and that Hughes, as Preston (No. 1,930,908) in the same year, came to a tenable conclusion when he asserted in his specification that blocking of the air passages could take place, although, I repeat, it is not too clear how he arrived at his conclusion. It follows from the expert testimony that Hughes' device was useful with respect to low fusion point coal burned over a tuyere with multiple air vents or channels.[1] (Where the air vents of a tuyere are large, as in the Alpern tuyere, the problem of clogging is hardly present).

In determining the question as to whether Hughes' device reflects invention, it should be kept clearly in mind just what Hughes did with respect to tuyere members. Simply, as stated above, he undercut the ribs adjacent the edge of the fuel supporting portion of the tuyere member and thereby provided a ledge to keep the dripping slag away from the tuyere air vents and blocking them. This is the essence of Hughes' alleged invention, not, as the plaintiff argues, the construction of what is called in claim 5 a "peripheral channel". Hughes' claims were directed to the over-

hanging eave feature of his construction when first allowed by the patent office examiner on April 16, 1931. (File Wrapper p. 36). Thereafter, on April 14, 1932, about a year after the original claims had been allowed and some months after the original application had been permitted to lapse, the patentee renewed his application and attempted to secure a claim embracing "means defining * * * a channel adjacent the edge each of said fuel supporting surfaces, and communicating with a respective series of said channels". This was rejected as functional and indefinite as it should be. (Cf. Walker, Dell. Ed. Vol. II, p. 790 et seq.). The peripheral channel in claim 5 of the patent is the effect of the construction involved and the patent office would allow the claim only in the language set out in the claim, i. e., "said means * * * forming *in effect* a peripheral channel which communicates with said first mentioned air channels". (Italicizing mine.) The patent office limited Hughes' claims strictly to the type of construction described (File Wrapper pp. 43, 49) and his contribution to the art must be considered in the light of the narrow claims accorded to Hughes, since the claims measure the invention.

One of the usual indicia of invention is lacking in this case. There was no long-standing problem which the art was trying to solve prior to Hughes. He and Preston, at about the same time, were the first to discover the problem described existed. I have found that Hughes' device was useful, at least to a limited degree, but that conclusion can in no way be based on the solution of a long-standing problem that the art had attempted, but failed to solve. Cf. Expanded Metal Co. v. Bradford, supra.

█ Assuming the device in the patent in suit had utility, what was new about the mechanical construction utilized to eliminate the clogging of the air vents in the tuyere block? It appears that Hughes employed an analogous use of an old expedient

---

[1] The plaintiff contends that the defense of lack of utility per se was not open to the defendants since they were, as the plaintiff claims, infringers. Cf. Boyce v. Stewart-Warner Speedometer Corp., 2 Cir., 220 F. 118; Forestek Plat-ing Co. v. Knapp-Monarch Co., 6 Cir., 106 F.2d 554, 558. The issue of infringement is not decided here because of the result reached on the question of invention.

to solve his problem. He employed the principle of an undercut or overhang to protect what lay underneath. Certainly the use of such an expedient to cause a vertical drip over the edge of the tuyere and thereby protect the surface or holes in the latter from being blocked is not a new principle. The eaves of a house, an awning, or any other type of overhanging ledge may serve as baffles to deflect the flow of water and protect the surface underneath. A baffle is a simple, well known device to deflect or regulate the flow of fluid substances and has been utilized to solve many problems similar to the one that confronted Hughes. Any skilled mechanic, ordinarily possessed of knowledge of analogous problems, when confronted with the specific problem the patentee had to solve would adopt the expedient employed by Hughes. I do not mean to convey the idea that simplicity necessarily denotes lack of invention (cf. Diamond Rubber Co. of New York v. Consolidated Rubber Tire Co., 220· U.S. 428, 31 S.Ct. 444, 55 L.Ed. 527), but it is settled that unless a useful device reflects inventive faculty it is not patentable. Leibing Automotive Devices, Inc. v. Wildermuth, 2 Cir., 104 F.2d 411, 412. That is the case here. That Preston (No. 1,930,908) filed his application for a tuyere block patent on June 21, 1928, just two months after the date of the Hughes application, and disclosed in his specification the same problem with respect to clogging tuyere air vents as Hughes and a construction similar in principle to Hughes to circumvent the difficulty is of some importance to show that Hughes' construction would be obvious to a mechanic, if we assume the conceptions of the patentees to be independent of each other. The Preston patent, issued October 17, 1933, the date of the Hughes patent, adopted the same expedient of undercutting as Hughes. Preston beveled or slanted rearwardly the forward ends of the ribs forming the air channels so that they terminated inwardly of the forward edge or toe of the tuyere plate. The difference between the patented structures in the two patents is that Hughes was limited to ribs which terminate inwardly of the edge of the tuyere plate whereas Preston's ribs extend clear to the edge and are beveled, both forming a space at outer ends of the ribs to form an air space through which the air from the channels could flow if a curtain were formed by slag drip. If the claims of these two patents were not limited in the manner suggested, it would be difficult to define any patentable difference between the patents pending at the same time in the patent office. Whether there is any difference in principle is not a question for this court to determine.

Priebe (No. 1,676,349, issued July 10, 1928) is pleaded as an anticipation of the patent in suit. In this patent the tuyeres are arranged vertically instead of horizontally, as in Hughes. Priebe's specification discloses, as one of the features of his invention, along the outer edge of each tuyere side bar where it contacts the fuel in the retort, an inclined or. beveled extension or rim slanting outwardly beyond the exits of the air apertures. As the fuel travels rearwardly in the retort the fin acts as a guard to keep the fuel and fuel ash out of the apertures.

It is not necessary for this court to pass on the question whether Priebe's structure anticipates Hughes. (See File Wrapper, p. 19, which discloses that early in the proceeding the patent office decided that Priebe and Lundgren (No. 1,604,648) anticipated Hughes.) What Priebe does disclose is that even in the very art we are concerned with it was a well known expedient to utilize an overhanging shelf or ledge with the result that the fins terminated short of the edge of the Tuyere sidebar and thereby protected the air channels from clogging. The overhanging or undercutting principle for protecting air vents in tuyeres was old when Hughes applied for his patent. Reiterating, there is no occasion here to determine that Priebe anticipates Hughes, it is plain that Priebe's device in a vertical position would not have the tendency to keep dripping slag from the air vents, but if placed in a horizontal position in the fuel chambers, as Hughes, they would tend to accomplish that result.

These considerations lead this court to conclude that Hughes made, if any, a slight contribution to the art, in view of

Thompson, Alpern, and Priebe, and, as demonstrated above, what he contributed lacked invention.

The Circuit Court of Appeals for the Sixth Circuit in the case of E. H. Bardes Range & Foundry Co. v. American Engineering Co., 109 F.2d 696, decided the patent in suit valid. However, neither in that court nor in the district court, American Engineering Co. v. E. H. Bardes, Range & Foundry Co., D.C., 25 F.Supp. 623, 626, was the defense of invalidity stressed. In fact both courts regarded that validity was conceded by the defendant. The case here was tried in great detail; the defense of invalidity was relied upon in its full measure.

The conclusion is that the patent in .suit is invalid for want of invention. This makes it unnecessary to consider the defense of non-infringement which is a serious question in the light of the commercial structure of the defendants and the Preston patent, the latter not before the court in the Bardes case, supra, as far as I can determine.

Judgment for the defendants with costs.