### BOYCE et al. v. PYRENE MFG. CO.

(District Court, D. New Jersey. April 28, 1923.)

1. Patents ⚖➔328—1,090,776, for motometer, held valid and infringed.

The Boyce patent, No. 1,090,776, for a motometer for use on automobiles, *held* valid as against the defense of prior use and anticipation; also *held* infringed.

2. Patents ⚖➔54—Abandoned casual use not "prior use."

An abandoned casual or experimental use of a similar device, without appreciation of its value for the purpose of the patented device, will not constitute a prior use to invalidate the patent.

[Ed. Note.—For other definitions, see Words and Phrases, Second Series, Prior public use.]

3. Patents ⚖➔36—Great utility and value of new device conclusive of invention.

Where a patented device has accomplished a result never attained before, has been of great value, and achieved undisputed success, the patent will not be held invalid for want of invention.

In Equity. Suit by Harrison H. Boyce and the Motometer Company, Inc., against the Pyrene Manufacturing Company. Permanent injunction granted.

Charles Neave and Edmund Quincy Moses, both of New York City, and Joseph H. Milans, of Washington, D. C., for plaintiff.

F. P. Warfield, L. A. Watson, and Lawrence Bristol, all of New York City, for defendant.

BODINE, District Judge. [1] The patent in suit is United States patent No. 1,090,776, issued March 17, 1914, to Harrison Hurlburt Boyce, and involves the well-known MotoMeter device now used as

⚖➔For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

standard equipment on 170 makes of motor vehicles. The invention is described in the patent as follows:

"My invention broadly comprehends the provision or arrangement of means for indicating the condition or temperature of the engine, the action of the temperature indicating means being governed or controlled by the water or other circulating medium employed for producing such variations in the temperature of the cylinders as may be necessary or desired by the operator.

"I have found that many, if not most, of the troubles to which internal combustion engines are subject, result directly or indirectly in a change in the temperature of the engine and cooling system, this being true, for instance, of such contingencies as imperfect lubrication, improper adjustment of the carbureter, insufficient water in the radiator, failure of proper circulation of the cooling water, broken fan belt, etc.; and it is an object of the present invention to provide an effective indicator, governed by such changes of temperature, which will call to the attention of the operator the existence of conditions inimical to the satisfactory operation of the engine, arising from any of these or similar causes. * * *

"Positioned centrally of the device and supported within the frame 28, but preferably thermally insulated therefrom by a concrete or other nonconducting filling 30 is a thermometer 31, the upper portion thereof being secured to the circular plate or disk 32 by the strap 33, the teat or extremity of the thermometer being seated within the orifice 34 in said plate. As will be observed, the lower portion of the thermometer extends through the protuberant porion 24, which is provided with a central bore 35 for the purpose, the enlarged portion or bulb thereof extending below the plane of the protuberance 24 and *within the air space or pocket 36 formed in the inlet 20 and the upper part of the radiator above the level of the water within the radiator 7.* * * *

"It will be apparent from the foregoing that the bulb of the thermometer 31 extending into the air space 36 will cause the indicating fluid, which may be alcohol, glycerine, or any other suitable medium which will retain its homogeneity or solidity, regardless of the vibration of the system of which it is a part, to respond to changes in the temperature of the amosphere within the air space 36, which is in proximity to the point of inflow 19 of the heated water coming from the cylinder jackets."

Claim 6, as follows, is as broad as any of the claims:

"In a system for indicating abnormal conditions in an internal combustion engine provided with a liquid circulation, cooling system for the cylinders of the engine, said cooling system including a radiator *having an air space therein* above the level of the circulating liquid, the combination with the radiator of an indicating device normally permanently carried by said radiator and comprising a thermometer having a bulb *normally located in said air space at* the top of the radiator and having an outwardly projecting visible tube, and a protective casing for the projecting portion of said tube." (The italics are mine.)

Prior to the invention there existed no effective device for giving drivers of automobiles warning of engine trouble. At first, people did not take the Boyce instrument seriously. It was looked upon as an ornament, and its utility was not realized. Mr. Harry C. Stutz refused to use the instrument. Mr. Boyce, with great persistency, taught drivers of racing cars the advantages of the instrument, and by degrees the certain warning of engine trouble was appreciated. Over 7,000 instruments are being manufactured every day and 3,500,000 have been sold, having a retail sales value of over $20,000,000.

If the Boyce patent is valid, the defendant is a willful infringer. The defendant makes an instrument formed with a casing substantially iden-

tical with the corresponding part of the plaintiff's instrument and procured from the same manufacturer; also similar crystals, retaining rings, and dial plates are used. Many of the parts are actually interchangeable, and this similarity is not a matter of mere coincidence. The defendant started in business after its president had a long talk with the plaintiff's sales manager. He was told of the patent, and was given a copy also of the decision in the case of Boyce v. Stewart-Warner Speedometer Co. (Circuit Court of Appeals for the Second Circuit) 220 Fed. 118, 136 C. C. A. 72. In that case, the patent was sustained. No motion was made for a stay of the preliminary injunction granted in the case until after final hearing.

The slavish imitation by the defendant and the purchase of parts from the same manufacturer, who supplies the plaintiff's parts, and the decision in the Stewart-Warner Case—an instrument with a movable indicating hand rather than an indicating tube—makes it necessary to consider only the question of the invalidity of the patent.

Much time was spent in attempting to show the prior use by Frederick Purdy, an experienced engineer employed by the Thomas E. Jeffery Company, manufacturers of the Rambler car. Purdy placed in the radiator of his car a thermometer. The car was used on the roads, and the thermometer was for the purpose of indicating to Purdy the temperature at which the car would operate most efficiently, and did indicate to him dangerous conditions, when the cooling water was hot or the carbureter adjustment was rich. Purdy knew the automobile business thoroughly. He was not only an engineer, but a patent solicitor and inventor. He used thermometers, just as thermometers have always been used, to test the heat of water. He wanted to learn all that he could as to the operation and design of the water-cooling system of the car which he was building. The thermometer which he placed in his radiator cap was to keep him advised as to what was going on in the engine of the car, so that defects could be remedied and the design of the engine could be changed to meet road conditions and requirements. He also placed the thermometer in various parts of the cooling system, such as in the water leading from the bottom of the radiator to the cylinder water jackets. He was employed in building automobiles and used the thermometers to tell what was going on.

Boyce's purpose was to supply an instrument to the public by means of which the individual of nontechnical training operating a car might be apprised of dangers promptly. Had Purdy fully appreciated Boyce's invention, the Rambler car sold to the public in early days would doubtless have been equipped with a device similar to the Boyce Moto-Meter; but Purdy, like the men at the automobile show, did not realize the advantages to be obtained by the public from the use of a device like the MotoMeter. He never conceived of the device in suit. He was doing no more than had always been done in the laboratory, when it was desirable to obtain the temperature of a given body of water. He did not realize that by means of the device, such as the Boyce engine trouble might be promptly detected, and that prompt detection of engine trouble was a decided advantage to the driver of an automobile.

Purdy, like many after reading the disclosure of a patent, says, "All that I knew long ago." His trained mind was freshened and awakened by the disclosure of the patent in suit. It is impossible to believe that after a lapse of years he could distinguish between what he had actually done and what he thought he had done. But all that Purdy seems to have done was to use a thermometer, and the ordinary thermometer that he used would not give the results attained by the Boyce device, which is so arranged and so constructed as to give a sudden jump when the temperature of the cooling fluid becomes excessively hot.

The MotoMeter gives a lower indication than the actual water temperature, because placed in the air pocket above the water, and when steam is formed by overheating and reaches the thermally responsive element of the instrument, there is a quick jump upwards, producing a signal most obvious and most distinct. If the instrument showed the variation of water temperature, the increase from normal to the danger point would be gradual, and the jump upward would not occur; the mercury would slowly rise in the instrument, and the disclosure would not be so obvious to the ordinary driver. It is clear that Purdy's thermometer required constant watching. There was no jump upward. It was placed in the water used in the cooling system, and would indicate nothing, except to the trained engineer, using it for experimental purposes. The witness, who was called for corroboration of Purdy, added nothing to the force of his testimony. The Circuit Court of Appeals for the Second Circuit said, in the Stewart-Warner Case, supra:

"No prior use which has ever been made of a thermometer was brought to the attention of the court which contained any suggestion of the novel mode of operation used in the Boyce device, nor did it appear that any thermometer was ever used to secure any result at all analogous to that secured by the invention of the patent in suit."

Purdy never conceived of a MotoMeter. All he ever did was to stick a thermometer in the water to see how hot it was, and from time to time read the thermometer. A chauffeur named Moore, who drove for a doctor, testified to the use of a thermometer to find out the water temperature in the doctor's car. There is nothing to indicate that Moore actually did what he said he did, and it seems most unlikely that any person would permit a chauffeur to experiment with the mechanism of an expensive car, or would drive around the streets with thermometers sticking out at various parts of the engine hood.

A gas engineer, by the name of Avery, who desired "to smash the Boyce patent," told of his experience with placing a thermometer at various points on his car to indicate water temperature. The thermometer placed in the radiator cap finally broke off and was thrown into the ash heap. There was some corroboration of Avery's testimony, but it is apparent that none of these experimenters conceived the advantage of placing the bulb above the water in the air reservoir. They did no more than place a thermometer somewhere about a car for the purpose of indicating something most of them did not understand.

There is nothing in the case to indicate that any of the 170 manufacturers of automobiles now using the Boyce MotoMeter, or any one

else, ever realized the utility and advantage of anything like the device until Boyce placed his meter upon the market. Had testimony been introduced to show that thermometers had been used in laboratories, or had testimony been introduced to show that thermometers had been used in cooking machines, bath tubs, and what not, such evidence would have been as pertinent to show a prior public use as the evidence adduced at the trial. Some of the witnesses were interested. Some had scientific knowledge. All were familiar with the Boyce patent. All told what they tried to do, and the sum of what they tried to do was to find out the water temperature, and to find it out with a thermometer.

The Boyce device does more than disclose the water temperature. It is not placed in the water, but is placed above the water, at a point where the radiator is cooler than the water until steam forms. As soon as steam forms, the air space becomes hot, and the Boyce Moto-Meter quickly jumps forward. Everything is arranged, so as to accentuate a quick jump in the temperature of the air space above the water, when steam is formed. In this function there was novelty, and in this function there was utility, and in this function lies the basis for the commercial success which Boyce has earned. The Supreme Court, speaking through Mr. Chief Justice Taft, in Eibel Process Co. v. Minnesota & Ontario Paper Co., 43 Sup. Ct. 322, 67 L. Ed. ——, decision rendered February 19, 1923, and not yet [officially] reported) said:

"It is true that some witnesses testify that they realized, before Eibel's application, that speeding up the stock to equal velocity with the wire would solve the difficulty and aid the speed. But there is not a single written record, letter, or specification of prior date to Eibel's application that discloses any such discovery by any one, or the use of the pitch of the wire to aid the speed of the machine. The oral evidence on this point falls far short of being enough to overcome the presumption of novelty from the granting of the patent. The temptation to *remember in such cases and the ease with which honest witnesses can convince themselves after many years of having had a conception at the basis of a valuable patent, are well known in this branch of law, and have properly led to a rule that evidence to prove prior discovery must be clear and satisfactory.* Barbed Wire Patent Case, 143 U. S. 275, 284; Loom Co. v. Higgins, 105 U. S. 580, 591. Indeed, when we consider the indisputable fact that Eibel's successful experiment at Rhinelander and his application for a patent surprised the whole paper trade, and that for a short time many held back from risking so radical a change and then all adopted it, oral evidence that some persons had discovered the source of trouble and the means of remedying it some years before Eibel is incredible." (The italics are mine.)

[2] The sketches, drawings, photographs, and other exhibits offered by defendant, in support of the testimony of the witnesses called to establish prior public use, are all subject to the same doubts and the same infirmities as their oral testimony. Not a single original device or reproduction was produced in court in support of the testimony. The testimony, at all events, goes no further than to show that the use which the witnesses may have made of the thermometer was but a casual one and that all lacked a full appreciation of the device of the patent. As was said by Judge Archbald in Anthracite Separator Co. v. Pollock (C. C.) 175 Fed. 108:

"A prior use, in order to negative novelty, must be something more than an accidental or casual one. It must, indeed, be so far understood and practiced, or persisted in, as to contribute to the sum of human knowledge and be accessible to the public, becoming an established fact in the art. Gayler v. Wilder, 10 How. 477, 497, 13 L. Ed. 504; Tilghman v. Proctor, 102 U. S. 707, 26 L. Ed. 279; Acme Flexible Clasp Co. v. Cary Mfg. Co. (C. C.) 96 Fed. 344; Ajax Metal Co. v. Brady Brass Co. (C. C.) 155 Fed. 409. There is not the remotest approach to anything of that kind here. No doubt, as already stated, there was a conforming structure, with a somewhat similar function, and looking back with the light which we now have, we are able to see that the parties had the device of the patent almost, if not quite, in hand. But they did not follow it up, as they should, and, stopping short where the present inventor went on, it cannot be brought in now to anticipate and defeat what he has successfully achieved by himself."

All abandoned their experiments before completion.

"A prior invention, abandoned, is merely an experiment, and does not affect the rights of another inventor, who takes up the subject and perfects the invention for actual use. Whiteley v. Swayne, 7 Wall. 685, 19 L. Ed. 199." American Metal Cap Co. v. Anchor Cap & Closure Cor. (D. C.) 278 Fed. 672.

A number of patents were introduced in evidence, some of which were not before the Circuit Court of Appeals for the Second Circuit in the Stewart-Warner Case, supra. Of these the Van der Veene French patent, No. 335,018, of September 3, 1903, shows a thermometer of a differential expansion type. There is nothing in this patent to indicate that the device was part of a permanent motor vehicle design for warning the operator of engine trouble. It is nothing more than a disclosure of the form of a thermometer for measuring the temperature of the cooling water of the engine. The instrument shown in the patent is one where the thermally responsive element would not rest in the space above the water, but would rest in the water itself. The advantages attained by the MotoMeter device would not thus be secured, and an examination of the patent reveals that its chief similarity to the defendant's device is that it is a mechanical thermometer having a round dial with a pointer to indicate the changes in the degree of temperature. The dial is not shown faced up so as to be visible to the driver of the car using the device, nor is there anything to indicate that it could be placed in the radiator cap.

The De Dion and Bouton British patent, 9,732 of 1896, has for its object:

"To enable the cylinder and other water-jacketed parts of an explosive motor to be kept cool by means of a much smaller quantity of water than is generally required for this purpose."

The system being a closed pressured system provided with a safety valve and a pressure gage, there is no suggestion whatever of the Boyce disclosure. Accompanying the patent is a drawing, which like the Van der Veene drawing may, by a stretch of the imagination, be said to look like the Boyce MotoMeter when placed in position. On such imaginary concepts, established property rights cannot be shattered.

The Adams United States patent, 827,698, is not pertinent. The Adams device stopped the car when there was any trouble with the

engine. How dangerous such a device would be is apparent to any one accustomed to riding in a motor vehicle. Adams also suggested a device by which a bell would ring; another most offensive device. Certainly it cannot be said that Adams, who would ring a bell or automatically stop a car whenever engine trouble existed, anticipated the Boyce contrivance. There is little wonder that the Circuit Court of Appeals for the Second Circuit, after examining the prior art patents, said in the Stewart-Warner Case, supra:

"In the case at bar our attention has been called to a number of prior patents which defendant alleges show that the complainant's device was anticipated, but an examination of the patents referred to convinces us that there is absolutely nothing in the claim of anticipation by the prior art. The prior patents do not disclose, or in any way suggest, the invention of the patent in suit."

The patent reference to the Boyce patent, No. 1,275,654, can in no way affect the validity of the patent in suit. See Miller v. Eagle Mfg. Co., 151 U. S. 186, 196, 14 Sup. Ct. 310, 38 L. Ed. 121. As was said by Judge Blatchford in Strong et al. v. Noble et al., Fed. Cas. No. 13,543, 6 Blatch. 477:

"There is scarcely a patent granted that does not involve the application of an old thing to a new use, and that does not, in one sense, fail to involve anything more. But the merit consists in being the first to make the application, and the first to show how it can be made, and the first to show that there is utility in making it."

[3] Applying the test laid down by the Circuit Court of Appeals of the Second Circuit in O'Rourke Engineering Co. v. McMullen et al., 160 Fed. 933, 88 C. C. A. 115, as follows:

"The principal question in such cases is: Has the patentee added anything of value to the sum of human knowledge? Has he made the world's work easier, cheaper, and safer? Would the return to the prior art be a retrogression? When the court has answered this question, or these questions, in the affirmative, the effort should be to give the inventor the just reward of the contribution he has made. The effort should increase in proportion as the contribution is valuable. Where the court has to deal with a device which has achieved undisputed success, and accomplishes a result never attained before, which is new, useful, and in large demand, it is generally safe to conclude that the man who made it is an inventor. * * * The keynote of all the decisions is the extent of the benefit conferred upon mankind. Where the court has determined that this benefit is valuable and extensive, it will, we think, be difficult to find a well-considered case where the patent has been overthrown on the ground of nonpatentability,"

there can be no doubt but what Boyce secured a valid patent.

The preliminary injunction will be made permanent.