### PYRENE MFG. CO. v. BOYCE et al.

(Circuit Court of Appeals, Third Circuit. July 11, 1923. Rehearing Denied October 4, 1923.)

No. 3020.

1. Patents ⊚⇒16—"Invention" defined.

"Invention" is a concept or thing evolved from the mind, and is not a revelation of something which existed and was unknown, but the creation of something which did not exist before, and possessing elements of novelty and utility in kind and measure different from, and greater than, what the art might expect from skilled workers.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Invention.]

2. Patents ⊚⇒328— 1,090,776, for indicating device for radiators of internal combustion engines, held valid, not anticipated, and infringed.

The Boyce patent, No. 1,090,776, for a device to be attached to radiators of internal combustion engines to indicate danger from overheating, by disclosing any sudden rise of temperature in the air space therein, held to involve invention, not anticipated, and infringed.

3. Patents ⊚⇒62—Evidence of prior use must be clear and satisfactory.

Evidence of prior use, which will negative novelty under Rev. St. § 4886 (Comp. St. § 9430), must be clear and satisfactory, and every reasonable doubt should be resolved against the one raising the question.

Appeal from the District Court of the United States for the District of New Jersey; Joseph L. Bodine, Judge.

Suit by Harrison H. Boyce and another against the Pyrene Manufacturing Company. From a decree for plaintiffs (290 Fed. 998), defendant appeals. Affirmed.

Francis B. Bracken, of Philadelphia, Pa. (Frederic P. Warfield and L. A. Watson, both of New York City, of counsel), for appellant.

Charles Neave and Edmund Quincy Moses, both of New York City, and Joseph H. Milans, of Washington, D. C., for appellees.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

WOOLLEY, Circuit Judge. The respondent appeals from a decree of the District Court holding valid and infringed Letters Patent No. 1,090,776, issued March 17, 1914, to H. H. Boyce for an indicating system and apparatus for internal combustion engines. All claims are in suit. Infringement is denied and the validity of the patent is challenged mainly on grounds of anticipation, prior use, and lack of invention.

The patent apparatus is the small thermometric device positioned in the top opening of the radiator of a motor car, familiar to automobilists. Claim 2, a typical claim, reads as follows:

"In a system for indicating abnormal conditions in an internal combustion engine provided with a liquid circulation cooling system for the cylinders of the engine, said cooling system including a radiator having an air space at the top thereof, the combination with the radiator of an indicating device having an indicating part outside the radiator and having a temperature responsive element controlling the operation of said indicating part and exposed to the temperature in said air space above the level of the liquid in the radiator and means for maintaining the temperature responsive element in place in the radiator during the normal operation of the engine."

The respondent says that this claim, stripped of its technical wording, discloses nothing more than a thermometer stuck through the radiator cap of an automobile. On first view this would seem to be true. It further urges that the only function of the thermometer, so positioned, is the ordinary one of showing the temperature inside. This would seem to be obvious. The respondent therefore maintains that in placing a thermometer in a cooling system to determine the heat of the engine nothing of invention is involved. This, too, was our first impression. But on closer examination of the patent it appears that a purpose is intended and, by reason of the particular location of the device, a result is obtained different from and definitely more useful than the mere registration of heat.

[1] On the major issue of validity we shall first inquire whether the conception for which the patent was granted involves invention. Because of the lack of a definite rule, questions of this kind are often perplexing. It is a trite saying that invention defies definition. Yet, through long use, the word has acquired certain characteristics which at least give direction to its meaning. Invention is a concept; a thing evolved from the mind. It is not a revelation of something which exists and was unknown, but is the creation of something which did not exist before, possessing the elements of novelty and utility in kind and measure different from and greater than what the art might expect from its skilled workers.

[2] The inventive conception of the patentee is substantially as follows:

First, the invention relates to a system for indicating the condition of internal combustion engines of the type wherein the cylinders are cooled by a fluid medium (water or alcohol) circulating around them. While the invention is generally applicable to stationary explosive engines, it is especially adaptable to automobile engines whose cylinders are cooled by a liquid delivered and thermally stabilized by a suitable medium such as a radiator placed some distance from the

engine. Although the invention is not limited to the latter use, we shall for convenience speak of it as an automobile accessory.

Next, the invention is based on the known construction of internal combustion engines and on known conditions arising from them, and particularly on changes in temperature of the engine and cooling system. A combustion engine generates much heat. When possible, overheating should be avoided. This condition may be due to a variety of things as, for instance, operating with the throttle wide open and the spark retarded, insufficient lubrication, frozen or clogged pipes, insufficient water, loose fan belt, defect in pump whereby the circulation of the cooling medium is arrested. The invention of the patent does not correct any of these evils. Its purpose is to disclose them, and to disclose them to the operator of the machine in time for him to correct them before injury results. The patentee, therefore, has aptly named his invention an "indicating system and apparatus."

Finally, the inventive conception of the patent is embodied in the familiar little device, circular in shape, box-like in character, the front and rear made of glass, the front open and the rear closed (except for an open circle at the top), enclosing what the patentee terms a "temperature responsive element" (which for our purpose is a thermometer of magnifying glass and colored alcohol visible through the open face) extending down through a threaded and perforated prong. The device is commercially known as "Boyce Moto Meter." Lying in one's hand it looks like a thermometer of unusual design and suggests nothing of invention. When in use, however, the device is substituted for the inlet cap at the top of the radiator and is screwed upon the inlet opening. Its protuberant part or prong, enveloping the bulb of the thermometer, extends into the air space or pocket above the level of the liquid in the radiator where the bulb is exposed to and its action regulated by the temperature of the air within.

Postponing for later discussion the question of prior use, we shall here dispose of any question of anticipation by prior patents by announcing our conclusion, in harmony with that of the Circuit Court of Appeals for the Second Circuit in Boyce v. Stewart-Warner Speedometer Corporation, 220 Fed. 118, 136 C. C. A. 72, that all references having to do with temperature indicators whose parts are immersed in the circulating fluid or attached to the machinery itself are so different in construction and mode of operation from that of the patent that they play no part in the case. We are also in accord with the Circuit Court of Appeals for the Second Circuit that, before the invention in suit, there was no thermal indicating device shown by the evidence which was positioned in a like air space below the opening of the radiator and which depended upon the temperature to which it was there exposed as the source of the information which it carried above and disclosed. We have paused to lay stress on the position of the lower extremity of the thermometer in the air space above the level of the liquid in the radiator because, if there is invention in the system and apparatus of the patent, it must be found in the selection of the air space of the radiator inlet as the place for the novel behavior of the thermometer.

On first view this place would seem to be of little importance. Yet it developed that it has distinctive characteristics of which the patentee took advantage and of which, apparently, no one else had thought. They are these:

It has been found from experience that internal combustion engines work best at a temperature of about 180 or 190 degrees. It is also known that, from their very nature, they are inclined to overheat. To meet these conditions of heat requirement and heat production, cooling systems were provided in which, ordinarily, water was employed as the cooling fluid. But here was a problem of keeping the water cool enough to prevent overheating yet warm enough not to arrest the proper action of the engine. This problem was solved by a circulation cooling system in which a radiator is the controlling element. When the radiator receives the heated water it is cooled to a proper temperature by radiation, it is then returned to the cylinder jackets to perform its cooling function, it is heated again, and again returned to the radiator, and so on indefinitely. Thus it happens that in the cooling system the water is of different temperatures according to where it is and what it is doing. It also happens that up to a certain point there is a difference in the temperature of the water and the temperature of the air in the space or pocket at the inlet. The air space heats up slowly and there is a lag in temperature. The temperature of the water may be as high as 205 and the temperature of the air space may be, and usually is, 20 or 30 degrees lower. But should the temperature of the water rise to 212 and the water boil, steam will be emitted and immediately the temperature of the air space will rise from its previous low degree to that of steam. The effect on the thermometer bulb in the air space will be instantaneous, resulting in a sudden, an almost startling, jump from a low point on the indicating dial to a high point, thus warning the operator by a quick signal of danger that something is wrong with the engine. From this it will be seen that the purpose of the invention is not to register the temperature of the water as is ordinarily done by a thermometer but to indicate engine trouble by the sudden action of the thermometer. Indeed there is nothing on the device which gives the temperature in degrees. Stated otherwise, the purpose of the device is not to inform the automobile driver how hot the water in the cooling system is, for this would mean nothing to the ordinary driver; its purpose is to inform him that something has happened inside the engine hood so that he may stop and find it before it is too late.

The center of the invention, therefore, is the selection of the air space or pocket within the inlet of the radiator by which alone the requisite sudden action is given to the thermometer. This is quite obvious because, if, as in other arts, the bulb of the thermometer were placed in the water, the rise of the thermometer would be as gradual as the rise in the temperature of the water and no quick signal of impending danger would be given the operator. So also if the bulb of the thermometer were placed in the water, the thermometer would fail to give a correct reading upon the falling of the water level within the radiator. For example, if the water level should, because of leakage,

fall until it is below the bulb, the bulb would then be exposed to air above the water level, which, as before stated, is normally cooler than the water, so that a drop in temperature would be indicated by the instrument instead of the rise in temperature which would actually take place in the water. Probably the most important advantage of locating the bulb with its thermal responsive element in the air space of the radiator inlet instead of submerging it in the cooling liquid is that it will indicate a condition of danger upon the stoppage of the circulation of the liquid, while the submerged bulb will frequently fail to give such indication. This seeming paradox will be understood when it is considered that the submerged bulb registers the temperature of the water in the radiator, which, upon stoppage of the circulation, gets cooler and cooler in that part of the system and does not respond to the engine temperature. Accordingly the instrument submerged in the water of the radiator will show a fall in temperature even though the water may be steaming in the cylinder jackets. But if the heat responsive element of the indicator be mounted in the air space above the water level, the steam, as soon as it is formed in the cylinder jackets, will find its way into the air space whether the water is circulated or not, and, therefore, will immediately cause the rapid rise of the indicating fluid and give the desired danger signal.

We are satisfied that the claims of the patent are not limited merely to a "temperature responsive element," or, in other words to a thermometer, placed indifferently in a cooling system, but that they embody the novel idea of a thermometer positioned in a new place, where, by reason of the characteristics of the place, the thermometer, even if functioning in an old way, is caused to do a new thing. In this functioning of the thermometer, where speed in the rise of temperature and its consequent danger signal are the things sought and obtained, utility is obvious. To this conclusion we have been led by the device itself, without the aid of its commercial history. (This history is interesting, however, for it shows that when the devise appeared in the art it was regarded as so thoroughly useless that it provoked mirth among automobile engineers. But later it was accepted by the public to the extent of three and one-half million instruments of a retail sales value of over $20,000,000, and was adopted by manufacturers for regular equipment on one hundred and seventy makes of automobiles and trucks.) Therefore we are of opinion that the patent involves invention and that the patentee is entitled to the reward of a patent— unless, as the respondent maintains, he was not the first to conceive the invention and therefore was not the original inventor in the sense of the patent law. This brings us to the issue of prior use.

Novelty is negatived by prior knowledge and use of the thing patented. R. S. § 4886 (Comp. St. § 9430). Of such use the respondent cites four instances. One was the Fairbanks-Morse use. A stipulation as to the character of this use puts it out of the case.

Another was by Avery who for several weeks (or months) used several thermometers in various places on the radiator of his car, one in the cap of the filler spout.

The third was the Moore use. Moore, a chauffeur, having difficulty with his engine overheating, bored a hole through the radiator cap and

inserted a brewer's thermometer. The use was short-lived for Moore's employer objected to its appearance and caused it to be removed.

The fourth and most important was the Purdy use. Purdy was a designer of internal combustion engines for automobiles. Beginning about 1905 he was in charge of the experimental department of an automobile manufacturer. He carried on a great number of experiments in connection with every phase of automobile designing in the course of which he employed many and various instruments. He put thermometers at different places on the engine and on the cooling system in order to find the points of overheating and to design the structure so as to overcome the trouble. In the course of his experiments he placed a thermometer in the radiator cap. With this thermometer in place, as well as with thermometers elsewhere, he operated the engine in the factory for long periods and in the car for long distances. Clearly these were engine tests and the thermometers were used experimentally in different places to determine the engine's weak points in the matter of heating. His testimony was, in substance, that all these tests were experimental and were made to get proper ideas for the manufacture of engine parts and radiators in the ultimate construction of automobiles; that during a test the thermometer in the radiator spout was always in place and after a test it would be removed; and that his thought was to make the construction of the car good enough to avoid the necessity of having a thermometer upon it when it went out to the user and that if he had not done this he would have considered the engine a failure.

Winther, who arranged the cap thermometer for Purdy, testified that he had never given any real thought to the value of the Purdy device, although, in fact, when the device of the patent came out he thought "there is an idea I probably could have made use of" and recalled having dismissed the Purdy use from his mind as unimportant.

[3] It is well settled that evidence of prior use must be clear and satisfactory and in its consideration every reasonable doubt should be resolved against the one raising the question. Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U. S. 45, 43 Sup. Ct. 322, 67 L. Ed. ——; Barbed Wire Patent Case, 143 U. S. 275, 284, 12 Sup. Ct. 450, 36 L. Ed. 161; Coffin v. Ogden, 85 U. S. (18 Wall.) 120, 124, 21 L. Ed. 821.

The prior public uses of the invention of the patent on which the respondent relies appeal to us as merely incidental and casual uses. While very close to the invention of the patent in means and location, they were far different from the uses contemplated by the inventive concept of the patentee. Indeed it seems to us they were practiced without any conception of the inventive idea which later Boyce evolved. While the instruments used on these occasions may have performed in the manner of the patent, such performance (if it occurred) seems not to have impressed itself upon those using the instruments. In considering the several alleged prior uses set up by the respondent, we do not find that, within the authority of Gayler v. Wilder, 10 How. 477, 13 L. Ed. 504, they were "so far understood and practiced or persisted in as to become an established fact, accessible to the public and contributing definitely to the sum of human knowledge."

Though close to the invention of the patent, it clearly appears that the several users did not intend, and did not observe in their devices, the things intended and accomplished by the device of the patent in suit. Eibel Process Co. v. Minnesota & Ontario Paper Co., supra; Tilghman v. Proctor, 102 U. S. 707, 711, 26 L. Ed. 279. In other words, they did not have Boyce's inventive conception and, failing to have it, they abandoned their devices before they had passed the stage of experimentation.

Therefore we are of opinion that the novelty of the invention of the patent has not been negatived by prior use and that, accordingly, the patent is valid. We are also of opinion that as the "temperature responsive element" of the patent claims are not limited to alcohol but extend to such expansive metals as are employed by the defendant in its device, the patent is infringed.

The judgment below is affirmed.