## PYRENE MFG. CO. v. BOYCE et al.

(Circuit Court of Appeals, Third Circuit. August 4, 1924.)

No. 3157.

Patents ⬦⟳237—Modification of infringing device held not to avoid infringement.

A modification of a device for indicating temperature of automobile radiators enjoined as an infringement of Boyce patent, No. 1,090,-776, *held* not to avoid infringement, and its manufacture for sale a violation of the injunction.

Appeal from the District Court of the United States for the District of New Jersey; Joseph L. Bodine, Judge.

Suit in equity by Harrison H. Boyce and the Motometer Company, Inc., against the Pyrene Manufacturing Company. From a decree adjudging defendant in contempt for violation of injunction, it appeals. Affirmed.

Henry D. Williams, of New York City, and Francis B. Bracken, of Philadelphia, Pa., for appellant.

Charles Neave and Edmund Quincy Moses, both of New York City, and Joseph Milans, of Washington, D. C., for appellees.

Before WOOLLEY and DAVIS, Circuit Judges, and DICKINSON, District Judge.

WOOLLEY, Circuit Judge. In a suit between the parties as they stand on this record the District Court entered a decree adjudging Letters Patent No. 1,090,776 issued to Boyce for an indicating apparatus for internal combustion engines valid, finding infringement by the defendant, and enjoining it from further making, using and selling its device in violation of the plaintiffs' patent rights. 290 Fed. 998. On appeal this court affirmed the decree. 292 Fed. 480. Shortly thereafter the defendant

put on exhibition, with an avowed purpose later to put on sale, a modified construction of the infringing instrument. The plaintiffs, discerning no substantial difference in the two devices, promptly moved the court for a rule upon the defendant to show cause why it should not be attached for contempt. The court issued the rule and after hearing entered a decree by which it adjudged the defendant's modified construction within the scope of its final decree and within the prohibition of the injunction and accordingly held the defendant guilty of contempt. This appeal is from that decree.

Referring to our opinion reported at 292 Fed. 480, for a detailed description of the contesting devices and for a statement of the grounds on which we found one the subject of a valid patent and the other an infringement, we shall repeat only enough to disclose the issue in this proceeding for contempt.

The apparatus of the patent is the familiar thermometric device positioned in the inlet cap at the top of the radiator of a motor car, with its recording dial extending above the opening, visible to the operator, and a thermo-responsive member (a thermometer) extending below, not in the water but in the open space just above the water. It is commercially known as "Boyce Moto Meter."

The defendant's infringing device is similar in main essentials. It is positioned in the same place, with its recording dial above the radiator and its temperature responsive member below the inlet cap in the open space between it and the water. Its temperature responsive element is not the alcohol of a thermometer but is a metal which, being sensitive to heat, causes connecting mechanism to register heat variations. It is commercially known by the name of "Guardene."

Both instruments have the same object which is to apprise the operator of the automobile by eccentric heat registration of the dial that the motor is overheated and thereby to warn him to stop and find the trouble before injury is done. By our previous decision we found that the giving of this advance information of the motor going wrong was made possible by the selection of the air space in the radiator inlet as the place for the thermo-responsive element, because in this space the temperature is from 20 to 30 degrees below that of the water when the water has not reached the boiling point. When the water in the jackets boils and steam is emitted the temperature in this space rises suddenly, causing a quick response by the thermo element of the registering device. Regarding as the center of the invention the selection of this space, which alone gives the device of the patent its novel behavior, we found the patent valid and infringed.

The defendant, reading this construction literally, and quite correctly, felt that it was free to devise a structure in which the thermo-responsive element is placed, not in the air space of the inlet, but in the water of the radiator, thereby registering, not the jump of temperature to be found only in the air space, but the gradual temperature rise of the water. It then constructed the instrument complained of and called it the Improved Guardene.

This device is the old Guardene, just as it was made when found to infringe, over whose thermo-responsive member there is drawn and screwed a cylindrical wire mesh extension, about three inches long. The defendant contends that this extension is a new thermo-responsive element, which descends for a part of its length into the water of the radiator and there, taking up the temperature of the water, carries it up to the dial mechanism which registers it, and, in addition, registers it not suddenly but gradually. The defendant thus seeks to distinguish its new device from that of the patent in respect to both the position and function of the thermo-responsive element. Here is the issue.

Both parties submitted much highly expert testimony, to all of which we have given careful consideration. We shall not review it in this opinion. We shall only give a few of the practical reasons which have moved us to our decision.

Our first and indeed our only inquiry is— Does the new wire mesh extension (a) protect the stem or thermo-responsive element of the old instrument from the action of the air or steam in the inlet air space, and (b) cause the thermo-responsive element to respond to water temperature as distinguished from the temperature of the air space?

The wire mesh extension envelopes but does not enclose the old stem or thermo-responsive member of the infringing device. Its meshes—hundreds in number—are about one-sixteenth of an inch in size. Through them the thermo-responsive member can be plainly seen and through them air and steam can flow freely. This being so, the thermo-responsive element of the defendant's improved structure is the same as in the old

structure. It is in the same place, is exposed to the same temperature influences, and will respond to them in the same way. There can be no doubt about this. The only remaining question therefore is, whether the higher temperature of the water, advancing up the wires of the mesh extension, can beat the lower temperature of the air space in reaching the thermo-responsive element of the device and cause it to register water temperature.

We think it cannot for several reasons: The wire mesh extension is at best a variable heat conducting medium. Obviously, it will conduct heat only when attached to the device. Commercially it is packed with but detached from the old mechanism, with printed instructions to the purchaser to screw one upon the other before installing. This the purchaser may or may not do. Failing to do it, the device is the infringing structure, capable of being used precisely as the patented device is used. Weed Chain Tire Grip Co. v. Cleveland Chain and Mfg. Co. (C. C.) 196 Fed. 213; Parsons Non-Skid Co., Ltd., v. Atlas Chain Co., 198 Fed. 399, 117 C. C. A. 286. If the purchaser should join them, the extension would operate only when its lower end is submerged in water. With this in mind the purchaser is cautioned to keep the radiator of the car filled. When filled, the inlet air space remains. But everyone knows that when a radiator has been filled, the water rapidly expands on the initial heating, a portion overflows through the outlet and the balance evaporates progressively as the engine is operated. In consequence the extension will inevitably be out of the water for much of a run. The defendant meets this fact by saying that the water in its pumped circulation flows to the top of the radiator and strikes or splashes upon the wire mesh extension. It may do this to some extent, yet the higher temperature of the water transmitted to the lower end of the three-inch extension must decline as it ascends into and through the lower temperature of the air space. In following into a cooler zone a circuitous and interrupted pathway made up of scores of crossing wires and hundreds of interposed open spaces, the initial water temperature must recede step by step, until, when it reaches the nut to which the extension is attached at the top of the thermo-responsive stem, there can be little of it left. At best the temperature thus transmitted from the top of the wire mesh extension to the top of the thermo-responsive stem is not water temperature—it is something else. All the time this is going on, the temperature of the air space is playing its part upon the exposed stem—the old thermo-responsive element, in the old place, functioning in the old way.

The decree below is affirmed.