## BOYCE et al. v. TAFT–BUICK CORPORATION.

District Court, E. D. New York. December 12, 1929.

No. 3463.

Moses & Nolte, of New York City (Thomas Ewing and Edmund Quincy Moses, both of New York City, Joseph H. Milans, of Washington, D. C., and Clarence M. Crews, of New York City, of counsel), for plaintiffs.

John Thomas Smith, of New York City (Melville Church and C. B. Des Jardins, both of Washington, D. C., of counsel), for defendant.

GALSTON, District Judge. This is a patent infringement suit involving alleged infringement of letters patent No. 1,275,654 and letters patent No. 1,206,783. Both patents relate to equipment in automobiles to indicate to the driver the normal or abnormal condition of the circulatory water system.

The defendant is an automobile dealer charged with the infringement of these patents because of the sale of Buick automobiles equipped with thermometers for indicating to the driver the condition of the water in

the cooling system of the automobile engine. Defendant's thermometer and that defined in letters patent 1,206,783 are called "distant reading thermometers" because of their use for indicating the temperature condition at a point distant from the place of reading; whereas patent No. 1,275,654 purports broadly to cover an indicating device readable from the driver's seat of the automobile and having a temperature responsive element located in any position to be influenced by the changes of temperature within the cooling system.

The main defense is that the patents are invalid because they do not set forth patentable inventions. It is contended that the patents cover nothing more than the use of a thermometer in a normal manner with no new or unexpected results to indicate to the driver the temperature of the water in the engine cooling system. In addition to the defense of want of invention as to both patents, it is contended that patent No. 1,275,654 is void for double patenting.

Of patent No. 1,275,654, only claims 4 and 25 are at issue. All the claims of the second patent are involved.

While neither of the patents in suit has been adjudicated, another patent, No. 1,090,776, of the same inventor, relating to the same art, has been sustained. Boyce et al. v. Stewart-Warner Speedometer Corporation (C. C. A.) 220 F. 118; Boyce et al. v. Pyrene Manufacturing Company (D. C.) 290 F. 998; Pyrene Manufacturing Company v. Boyce et al. (C. C. A.) 292 F. 480; Pyrene Manufacturing Company v. Boyce et al. (C. C. A.) 1 F.(2d) 185; Boyce et al. v. Semaphoric Indicator Company (D. C.) 24 F.(2d) 248.

In patent No. 1,275,654, issued on the earliest Boyce application, filed October 17, 1912, the inventor states that his invention "relates to indicating means associated with a motor propelled vehicle devised for the purpose of showing when trouble or abnormal conditions exist in the power plant thereof, whether such conditions result from overheating, or from the temperature of the engine or its cooling system being too low for safe or satisfactory operation."

The principal object of his invention was: "To provide means which may be organized in connection with a power plant of a motor driven vehicle for indicating to the driver of the vehicle at all times the working condition of the engine and for rendering it possible for him to ascertain the existence of abnormal and especially dangerous and possible destructive thermal conditions of the engine, which means by reason of the construction and arrangement thereof, may be easily read by the driver of the machine from his seat, obviating the necessity of close inspection to determine the existence of such abnormal conditions."

A specific object of the invention is stated to be the provision of an instrument, of the character indicated, on the radiator of the vehicle substantially in the line of vision of the driver.

Both claims 4 and 25 are broad claims:

"4. Means for indicating the thermal condition of the engine of an automobile having an internal combustion engine provided with a liquid circulation cooling system, comprising the combination with the cooling system, of an indicating device having an indicating part readable from the driver's seat of the automobile, and having a temperature responsive element located in a position to be influenced by changes of temperature within the cooling system."

"25. In combination with a vehicle, having an internal combustion propelling motor, a fluid containing means associated therewith so as to be influenced by temperatures of the motor structure and means for showing normal and undesirable conditions of the power plant, comprising a part mounted in temperature-responsive relationship to the fluid-containing means to be controlled by the changes in the temperature of said motor structure, and a slight indicator part associated with said first mentioned part, adapted to be affected by the changing temperature conditions of the latter and located to be read by the operator of the vehicle while driving the same, said indicator part being adapted to present varying indications normally to serve as a guide for the operator in driving the motor at proper temperatures and abnormally as a warning to prevent or overcome undesirable conditions in the power plant."

The prior art set up by the defense includes a number of patents, printed publications, and uses, the most important of which, so far as these two Boyce claims are concerned, is letters patent No. 1,159,918, granted November 9, 1915, to F. E. Fowler, Jr., on an application filed February 24, 1913. This patent in the statement of objects is not unlike that set forth in Boyce patent No. 1,275,654. Fowler says:

"One object of my invention is to provide a water-cooled internal combustion engine that comprises a visual means, preferably arranged in close proximity to the operator, for

indicating whether or not the water is circulating properly through the cooling system."

"Another object is to provide an internal combustion automobile engine that comprises means for showing the approximate temperature of the water in the cooling system after it has passed through the radiator and before it enters the water-jackets of the cylinders, said means consisting of a thermometer that is preferably arranged on the dash of the automobile in plain view of the driver or operator. And still another object is to provide an efficient device of simple construction that can be applied easily to an automobile for indicating the approximate temperature of the water in the cooling system before it enters the cylinders of the engine."

Fowler did not place his thermometer bulb in the neck of the radiator as in the earlier Boyce patent in suit, but provided a thermometer $E$ on the dash board of the automobile in view of the driver or operator; the lower end of the thermometer projected into a chamber $F$, into which chamber ran conduits2 and $3$, respectively, from the supply pipe $B$ of the cooling system and the return pipe $D$ thereof "thereby causing the cool water to circulate from the supply pipe $B$ through the chamber $F$ and then up to the return pipe $D$." He continues: "One desirable feature of an internal combustion engine of the construction above-described is that the operator always knows whether or not the water is circulating freely through the cooling system. If the thermometer shows that the water in the chamber $F$ is boiling or near boiling point, the operator knows that there is some obstruction in the system which prevents the water from circulating freely for when the water circulates properly it will always be below boiling point after it has passed through the radiator. Therefore, my invention tends to reduce the liability of the operator running the engine long enough after the circulating system has become clogged to cause the engine to overheat for a careful operator who watches the thermometer can tell immediately whether or not the cooling system is performing its function properly."

Of course, Fowler in his patent does not show the specific arrangement of thermometer in the radiator as is set forth in Boyce No. 1,275,654, but he does show enough, providing he is earlier in date of conception, to anticipate the two broad claims of the Boyce patent which are here in suit.

It was contended by Professor Reeve, the plaintiffs' expert, that the Fowler patent discloses an inoperative device, in that the conduits $2$ and $3$ would not function as indicated in the patent. That view is in disagreement with the opinion of defendant's expert engineer, Cecil H. Taylor. Whichever is the more correct view, it appears to me reasonably clear that part of the water of the circulating system of the Fowler device passes in and out of the well, and that the thermometer indicates the temperature of the water in the well. This may not be the most effective means of determining the temperature of the water in the system, nor indeed of reporting miscellaneous troubles that might arise in the circulating system, but within the broad terminology of claims 4 and 25, Fowler certainly has provided: (a) Means for indicating the thermal condition of an engine of an automobile having an internal combustion engine provided with a liquid circulating cooling system; (b) comprising combination with the cooling system of an indicating device having an indicating part readable from the driver's seat of the automobile; and (c) having a temperature responsive element located in a position to be influenced by changes of temperature within the cooling system. Broadly, therefore, Boyce is not entitled to the two claims sued on, providing Fowler anticipates him.

The Boyce application was filed October 17, 1912. I do not understand that he carries his invention back prior to the summer of that year. On the other hand, I am convinced from the testimony taken of the Fowler use that his invention, as described in figures 1 and 3 of his patent, was carried back to September, 1911. Fowler testified that this was done while he was a student at the St. Louis University and he did not leave that university until June, 1912. Even that date would be sufficient to anticipate Boyce. Fowler is strongly corroborated. There is the testimony of a number of witnesses and written exhibits which justify the belief that he proved beyond a reasonable doubt that he had invented and actually installed the well type of thermometer, with the conduit adjustments, in his Cadillac car in the fall of 1911. Incidentally the contention of inoperativeness of the Fowler device is met by the testimony of these witnesses, based as they are on actual observation and knowledge. Mr. Taylor also testified as to experiments which he made, and showed that a warning signal was given promptly by the Fowler thermometer when the radiator which was blanketed, and water was allowed to drain therefrom, and also when the tube at the lower end of the radiator was partly stopped, so that very little flow could get through.

In consequence, I am convinced that

claims 4 and 25 of Boyce patent, 1,275,654, are invalid in view of the Fowler patent. In this view of the case it becomes unnecessary to consider the defense of double patenting. ▇ We have to consider now Boyce patent, No. 1,206,783. An original application was filed June 20, 1914, subsequently divided, and the application on which this patent issued was filed August 30, 1916. The date of the invention is carried back by Boyce to March 16, 1914.

This patent is the third of the Boyce inventions and possesses great merit. The evolution of his discoveries shows that his original conception of the need of providing trouble indicators was solved first by fixing a thermometer in the radiator cap, as illustrated in figures 3 and 4 of patent No. 1,275,654. It is to be noted that the bulb of the thermometer as shown therein might or might not have been immersed in the water of the radiator. While that application was pending, he filed on January 3, 1913, an application which eventuated in letters patent No. 1,090,776, in which he limited the position of the bulb to the air space above the level of the water in the radiator. It was that patent which has been adjudicated in the cases referred to hereinbefore and the validity thereof established. Then in the development of the automobile art Boyce hit on the invention defined in letters patent No. 1,206,783 in suit, wherein he points out that: "In my Patent No. 1,090,776, dated March 17, 1914, I have disclosed a system and apparatus for indicating the thermal condition of an internal combustion engine embodying the use of a device having a temperature-responsive element located in the air space above the normal level of the water in the system, as set forth in said patent. I am by these means enabled to obtain a relative indication of the temperature of the cooling water and also obtain a danger signal immediately upon the formation of steam in the system which steam passes into the air space, thus causing a sudden increase in the temperature indication of the instrument. This construction does not normally give the actual water temperature but indicates a temperature somewhat lower than that of the water until the formation of steam takes place. For many purposes, the invention of this patent is most desirable and satisfactory, but under some conditions it is preferable to indicate the actual temperature of the heated water in the system. My present invention provides means whereby this actual hot water temperature is indicated at all times and which will also be subjected to the action of any steam which may form in

the system. Thus with this invention, it is possible to secure an indication of actual water temperature without sacrificing the advantages of obtaining immediate knowledge of a condition of danger suggested by the formation of steam."

Boyce's experience in the automobile art enabled him to say: "I have found that the temperature of the water in the cylinder jackets varies greatly in different parts of the jackets, being ordinarily coolest at the lower ends where it enters and gradually becoming heated, reaching its highest temperature only after it has surrounded the hottest part of the cylinder which is adjacent to the head and exhaust valve thereof, this part of the cylinder being where the ignition of the fuel charge takes place and where the highest temperature of combustion is reached. As explained above, the condition of danger in the operation of the engine corresponds for practical purposes with a condition in which the water in the jacket boils resulting in the formation of steam. It is highly desirable, therefore, to have an indication immediately upon the formation of steam in whatever part of the jacket this may take place. I have discovered that by providing means responsive to temperature changes and locating the same in the cooling system at or above the upper ends of the cylinders or at least as high as the combustion chambers thereof, the results desired are secured, as with this location of the temperature responsive element, it is not only subjected to the hottest water temperature, but as any steam formed immediately rises it is also in a position to be influenced by steam formed in any part of the cylinder jacket."

He determined that it was desirable to have his thermometer so positioned as to reflect the temperature of the water at its hottest point. He says: "In accordance with the present invention, I provide a device having a part responding to temperatures in the cooling system and having means for indicating such temperatures located in such a way as to be under the constant observation of the driver, such indicating means being preferably located on the dash or instrument board where the other instruments necessary for the operation of the car, such as the speedometer and ammeter, are customarily placed. I accomplish this result by employing means having a temperature responsive element which may be located in a part of the cooling system where it will be influenced by the temperature of the cooling water, preferably after the water has reached its highest temperature or of any steam which may form

in the jackets, and an indicating instrument located upon the dash, of such a character that it may easily be observed by the driver; these two instrumentalities being operatively connected by means which will cause the indicator to indicate the temperature to which the temperature responsive element is subjected, the operative connection being such that it will not be destroyed or affected by the decidedly severe and special conditions which exist in a motor vehicle."

The particular construction which he illustrates is readily understood. The temperature responsive element 20 in the shape of a bulb filled with an expansible fluid is mounted in the return pipe 6, which conveys to the radiator the hot water from the upper ends of the cylinder jackets. This location of the thermometer bulb is advantageous because it insures the measurement of the temperature of the water coming from the hottest cylinder. It also insures action from the bulb by steam formed in the jackets of any of the cylinders. Bulb 20 is connected by a flexible tube 21 of suitable material having a bore, filled with the expansible fluid, with the indicating instrument 22 mounted on the dashboard 16 of the automobile. Increase of temperature of the cooling water causes the fluid in the bulb 20 to expand and thus force the column of fluid to move in the tube 21 producing an increase of pressure in the Bourdon tube 23, and thus ultimately causing the hand 24 to be actuated. A cooling of the water would cause the fluid in the bulb to contract, thus relieving the pressure of the bulb and tube and permitting the hand 24 to return towards its initial position. The inventor emphasizes the effect produced by the instrument as "a warning signal directing the operator's attention to the approach of dangerous conditions of operation." It is perhaps fair to select claim 2 as typical of the claims of this patent: "2. In temperature indicating means for water cooled internal combustion motors of motor vehicles, the combination with a motor and the water circulation cooling system thereof, of a temperature-responsive element located in said system above the level of the hottest part of a motor cylinder, and in a position to be normally in contact with the cooling liquid after it has been heated by such hottest part, and to be subjected to contact with any steam which may be generated in the system due to the heat in the cylinder, and temperature-indicating means observable by the driver when operating the vehicle, said temperature indicating means being controlled by the temperature of said temperature responsive element."

As with the other patent in suit, the prior art adduced in the effort to prove want of invention consists of articles, text-books, magazines, patents, and prior uses. Generally, the subject is approached on the contention that however Boyce may have described his instrument, in the last analysis it is a thermometer, and that the uses of thermometers were thoroughly well known. Thus there were introduced in evidence catalogues of instrument makers showing thermometer dials and thermal responsive elements to record changes in temperature and suitable for many purposes. For the same general proposition may be grouped also the published art in respect to the use of thermometers for stationary engines. Specific prior art is narrowed then to that other class relating to uses on automobiles.

It is desirable, perhaps, to examine all of the references, at least briefly.

*The Witz Publication.* In 1892, Witz, an engineer, wrote a treatise on the theory and practice of gas motors, in which he stated, quoting from the accepted translation: "The cooling of the cylinder requires water, from 2 horsepower up. Most frequently, a circulation of water under pressure is provided, and one has only to decide upon the distribution; it is rarely that one makes use of the warm water coming from the cylinder. One adjusts the cooling in such a manner as to operate at the minimum at 60°, and if one uses good oil, there is advantage in going as high as 80°. Let a thermometer, then, be placed on the water outlet pipe, so that one can always follow its temperature."

That is all that Witz said about the use of a thermometer. He did not use it as an indicator of danger or as a trouble indicating device intended to attract the attention of the operator. The nature of a stationary gas engine and the conditions of its use, at least so far as its attendant operator is concerned, are radically different from those affecting the driver of an automobile. Mr. Taylor, the defendant's expert, in cross-examination admitted that the common practice with stationary engines was to allow the heated water to flow down some waste pipe. There is no closed cooling system, such as exists in an automobile, consisting of cylinder jackets and a radiator which hold but a limited amount of cooling water. The circulating system in an automobile requires that the water be propelled rapidly back and forth between cylinder jackets and the radiator. The amount of water thus utilized is relatively small. Moreover, it can absorb but a limited amount of heat and must rely for effective

operation upon the rather rapid dissipation of the heat by the radiator. It is imperative for automobile operation to prevent the water from becoming overheated, a condition that may result from the frequent period of circulation if the water through such circulation becomes hotter and hotter. Those conditions do not obtain in a stationary engine, for with such engine there is an additional fresh supply of cold water to draw upon and use, with means for discharging the heated water.

A second distinction may be pointed out in that, whereas a stationary engine may require an engineer, he is not usually compelled to attend at all times. Thus a thermometer on a water outlet pipe is not the means that would be employed ordinarily as a danger indicator, and certainly was not to be so employed under the teaching of Witz.

Finally it may be observed as a further element of difference between a stationary engine and an automobile engine that the conditions of operation with respect to the former do not momentarily change, that is, are relatively constant, whereas in the case of an automobile the operator should observe with a good deal of frequency the conditions under which the vehicle is moving.

*The Chabot Article.* In 1910 Lieutenant Chabot wrote a book on automobiles and their motors. After stating that, to be warned of troubles arising in the water circulation, the prudent chauffeur should always have a manometer before his eyes, Chabot describes the apparatus. He employs a cylindrical box bearing a graduated dial over which the needle oscillates. He says:

"If there is abnormal heating, the vapor produced by this excess of heat penetrates into the coiled tube of the manometer, uncoils it through its expansion, and displaces the extremity of this tube, to which is fixed the pressure indicating needle."

"The driver knows how many divisions the needle of the manometer ought to vary in normal operation, and if this variation increases, it is because something is wrong with the water circulation."

"The driver will then be able to search out these troubles before the motor has been hurt too much, for, in certain cases, if one is warned of the troubles arising in the water circulation, only by the gratings in the cylinder or the stopping of the motor, serious injury can have already occurred."

A manometer is not a thermometer, but a pressure gauge. Defendant's expert admitted that the Chabot device, since it was only an instrument to indicate pressure, would not indicate a difference in temperature of the water. In this article we have, however, at least the suggestion of a trouble indicator to warn the driver of abnormal operating conditions arising in the water circulation. Also there is appreciation shown of a connection from the outlet pipe of the cylinder to the manometer. Also distant reading thermometers of the vapor pressure type were well known at the date of the publication of this book by Chabot, as is shown by the article in the Commercial Motor of December 30, 1909. The fact remains, however, that Chabot did not fully within the limits of his own article describe a fully operative trouble indicating device such as is set forth by Boyce.

*Horseless Age.* This is an automobile journal and the particular issue referred to is that published August 14, 1907. The article by A. L. Clough mentions that in a road test made upon a cooling system, a thermometer was placed on the top of the radiator so that its bulb was directly exposed to the returning current of heated water which passed by a short pipe from the cylinder heads to the top of the cooler. This clearly was an effort by an engineer to investigate temperatures of a circulating system under normal conditions of operation. Such information was, of course, of value to the designer of an automobile engine and associated parts. There is, however, in the article no suggestion beyond that specific purpose. The same comment may be made of the article appearing in Motor Traction, June 12, 1909, and in the Horseless Age, July 14, 1909. It should be noted, though, in connection with this article that the thermometer was inserted in the water outlet manifold, i. e., at a very hot point of the water circulating system.

The article in Commercial Motor, December 30, 1909, contains the passage: "We would now direct our readers' attention to one important use to which the device might be applied for motor vehicles: the degree of superheat in the steam supplied to an engine is an all important factor for successful working, and with the aid of an instrument of the type shown in Fig. 5, the supply of liquid fuel to the burners of a steam generator could easily be regulated by the temperature of the steam."

It may be said of this article that there is nothing pointed out as to how the instrument could be utilized in the manner proposed by Boyce in his patent, No. 1,206,783.

The next group of prior art references to be considered are the uses. Perhaps the earliest of these is that of the Locomobile Company. In 1910, more than two years

before Boyce filed his first application, the Industrial Instrument Company of Foxboro, Mass., sold distant reading thermometers, substantially similar to those used by the defendant in this suit, to the Locomobile Company. These thermometers were used by engineers of that company for certain research work in connection with radiator designing. Mr. Rosner of that company testified that he ran an automobile on the road, equipped with a radiator that he was studying and with thermometers inserted at the top and bottom of the radiator, to determine the temperature of the cooling water at those two points. Subsequently he learned of the distance reading thermometer made by the Industrial Instrument Company and equipped an automobile with this thermometer, putting a bulb in the radiator cap and the dial on the instrument board. The use of these devices by the Locomobile Company, however, it appears was for comparative engineering testing. The devices were subsequently discarded, the instruments were removed, and the automobile sold by the manufacturer with no such device thereon. It does not appear that there was any appreciation that a device of the character thus used would have been at all of interest to the public as part of the equipment of an automobile.

Nevertheless, the question presented by this use is of exceeding interest. Here we have a definite conception of means not unlike the specific means described in Boyce patent. It cannot be said that the use of these thermometers by engineers of the Locomobile Company was experimental in the sense that we speak of a use as "experimental." The instruments were used in studying the radiator and the engine cooling system as a guide to better engineering practice. That is the position taken by the defendant, and undoubtedly the correct one; but its very correctness becomes its own limitation, for appreciation of the value of a thermometer as a guide to better engineering practice in the construction of the radiator or the engine contains no suggestion of its use as a trouble indicator to the ordinary driver of an automobile.

What have the two uses in common? How closely related are they? Does the use for engineering purposes inevitably and of necessity suggest its use as a trouble indicator? In other words, are the uses analogous? I think not. The matters in engineering construction which engage the interest and focus the attention of the designer are of no concern, certainly of no direct concern to the lay driver of an automobile.

Conversely, it may be said with equal truth that the daily trials and tribulations of an automobile driver arising from the clogging of the circulating system, the overheating of bearings, and what not, are of no concern to the automobile engineer, except in so far as they may point to a defect in design. I think there is no inevitableness of suggestion in the two uses. I think it required the inventive flash to conceive of a trouble indicator, even though in the state of the art it required no mechanical genius to adapt the means which the art furnished to the particular conception. Railroad Supply Co. v. Hart Steel Co. (C. C. A.) 222 F. 261; General Electric Co. v. Sangamo Electric Co. (C. C. A.) 174 F. 246; Justi v. Clark (C. C. A.) 108 F. 659; Barry v. Harpoon Castor Mfg. Co. (C. C. A.) 209 F. 207.

What has been said in respect to the Locomobile use applies equally to the Webster-Hudson use. The Fowler use may be discussed with the Fowler patent in its relation to this Boyce patent. Fowler undoubtedly conceived the idea of a trouble indicator. Likewise he had available all that the art taught with respect to thermometers, including thermometers of the distance type; but his adaptation of those means to the particular end was quite different from that of Boyce. It is not necessary again to discuss the Fowler patent in detail, for that was done in a consideration of the other Boyce patent in suit; but it is interesting to observe that, whereas the essence of the Boyce adaptation was for the purpose of obtaining information as to the hottest point in the circulatory system, Fowler proceeded in quite the contrary direction. After stating that he has shown the two conduits 2 and 3 "tapped into the supply and return pipes B and D, respectively, at points adjacent to the fourth cylinder of the engine," he adds: "I do not wish it to be understood that my invention is limited to such a construction for it is immaterial, so far as my broad idea is concerned, how the cooled water is supplied to the chamber F (i. e., the well), and conducted out of the same. In fact, the conduits 2 and 3 could lead directly to the bottom and top of the radiator without departing from the spirit of my invention, which, broadly stated consists in means for causing the cooled water that has passed through the radiator to act upon a temperature indicating device that will show the approximate temperature of the water before it is applied to the cylinders."

Thus Fowler was near to and yet ever so far from conceiving the Boyce invention. Fowler's interest was in cooled water, not hot

water. He thought it important for the driver to know how cold the water was *"before it is applied to the cylinders."* Well, that information apparently is of no use whatsoever and may explain why Fowler remained a paper patent.

There remain for consideration some miscellaneous patents, none of which strikes me as being important.

There is a patent to Dewey, No. 945,085. The inventor sought here to provide a water level indicator for boilers, and stated that it had special advantages when used in connection with boilers for motor vehicles. He also says that the thermometer may be placed on the dashboard whereby it can be readily seen and will give the proper indication of the water level. This is far removed from either the purpose or the means described in the Boyce patent.

British patent to Siemens, No. 24,389 of 1909, relates to a thermometer for indicating the temperature of superheated steam on a steam locomotive. The inventor provided a thermoelectric couple, the junction of which was exposed to the steam, and the temperature of which was to be measured, while the other end of the couple was connected with an indicator in the cab of the locomotive. This patent does not suggest the special function of the Boyce invention. There seems to be no reason for believing that the Siemens instrument could be utilized so as to warn the locomotive engineer of a dangerous condition. It seems, indeed, that its function was to enable the engineer to accumulate information for use by the engineering staff of the railroad. Mr. Taylor testified, it is true, that the locomotive engineer could control the degree of superheat and hold it at the most efficient operating temperature. There is, however, a vast difference between giving technical knowledge as to the temperature of the superheat to an engineer and indicating to a lay driver a dangerous condition of his engine calling for immediate correction.

From the foregoing discussion of the prior art, these facts stand out saliently, whereas: (a) Boyce was not the first to conceive of a trouble indicator for use in the daily run of an automobile (for Fowler and Chabot had done that); nor (b) was he the first to conceive of the specific means which he describes in his patent, for recording the temperature of the hottest part of the water circulating system of an automobile (since the engineers of the Locomobile Company and of the Webster-Hudson Company had done substantially that); nevertheless, he was the first to apply those specific means to that particular purpose. In doing so he performed an inventive act.

There can be no question of infringement of the claims of Boyce patent, No. 1,206,783, if that patent is valid.

A decree accordingly may be had in conformity with the foregoing opinion.